**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 19-CV-22864-COOKE/GOODMAN**

JUAN COLLINS, et al.,

      Plaintiffs,

v.

QUINCY BIOSCIENCE, LLC,

      Defendant.

_____/

**REPORT AND RECOMMENDATIONS ON**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

*"Memory … is the diary that we all carry about with us."*

- Oscar Wilde (Irish poet and playwright, 1854 - 1900)

This Report and Recommendations concerns a class certification motion filed by

two purchasers of Prevagen, a purported memory-enhancement product which Plaintiffs

say is "worthless" and which is featured prominently in an alleged deceptive marketing

scheme developed by Defendant Quincy Bioscience, LLC ("Quincy"). According to

Plaintiffs' amended complaint and class certification motion, Quincy manufactures,

markets, and distributes Prevagen. Prevagen is made with the protein apoaequorin

("AQ"), which Quincy represents to be "safe and uniquely supports brain function." [ECF

No. 15, p. 1]. More specifically, Plaintiffs Juan Collins and John Fowler contend that

Quincy has for more than a decade uniformly (and falsely) marketed Prevagen as "being designed for one purpose: to **improve memory**." *Id.* (emphasis added).

Plaintiffs filed their class certification motion [ECF No. 21] a little more than two months after the original complaint was served [ECF No. 4], a few days after they filed their first amended complaint [ECF No. 15] (which added Fowler as the second named Plaintiff), and before they obtained any discovery in the instant lawsuit. Nevertheless, Plaintiffs say they rely on discovery obtained in a similar class action lawsuit involving Prevagen (i.e., *Racies v. Quincy Bioscience, LLC*, U.S. District Court for the Northern District of California, Case No. 15-CV-00292-HSG) and on experts their counsel retained in this lawsuit. They also rely on deposition testimony obtained in this case from two Quincy executives.

Collins filed the initial complaint, which triggered Quincy's motion to dismiss challenging, among other allegations, Collins' standing to be a class representative. In the initial dismissal motion, Quincy argued that Collins' claims are atypical because he purchased Prevagen for someone with Alzheimer's disease[1] even though the label "makes clear" that the product is not intended to treat any disease. [ECF No. 8, p. 17].

---

[1]     The complaint was not filed under seal, and both the complaint and the motion to dismiss discuss the allegation that Collins' sister was diagnosed with Alzheimer's disease. The first amended complaint also discloses this bit of personal family medical background. Although later submissions by both parties redacted this personal information or were made in under-seal filings, Plaintiffs have now confirmed that they do not deem this information to be worthy of confidential or under-seal treatment. [ECF No. 101].

2

Although Fowler was added as another plaintiff (to join Collins) in the amended complaint, Quincy still (in both the renewed motion to dismiss and the class certification opposition) challenges the standing of both plaintiffs to pursue claims for Prevagen products they did not purchase. It also contests their typicality arguments and similarly contends that neither plaintiff is an adequate class representative.

At bottom, Plaintiffs allege that Quincy's representations about Prevagen's so-called memory-enhancement benefit are absolutely false and cannot possibly be true as a matter of body chemistry. Plaintiffs contend that AQ is "merely a protein that, once digested, is completely and rapidly digested and transformed into common amino acids (and possibly small peptides) no different than those derived from other dietary proteins and cannot cross the blood brain barrier to reach the brain or affect its functioning." [ECF No. 21, p. 2]. Similarly, they say that a single dose of Prevagen accounts for only approximately 0.013-0.053% of the protein the average person consumes daily, which means the protein consumed daily from Prevagen "amounts to a mere drop in the ocean that can have no measurable effect on the brain." *Id.*

Plaintiffs' amended complaint [ECF No. 15], which is subject to a fully-briefed and still-pending motion to dismiss [ECF No. 25], advances three counts: Counts I and II for violations of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), and Count III for unjust enrichment. In their motion, Plaintiffs seek to certify two classes of Florida-only FDUTPA classes of consumers who purchased Prevagen "during the fullest period

allowed by law." [ECF No. 21, p. 7].

During a multi-hour hearing on the motion, Plaintiffs' counsel explained that he intends to have the class definition date back to 2007, when Quincy first started selling Prevagen. But Quincy counters with the point that the representations it made on the product label and box about Prevagen have evolved and changed over time, which prompted Plaintiffs' counsel to say that he *might* seek to narrow the class period to fewer years than a period dating back to the product's 2007 launch.

But that has not happened.

In addition, the FDUTPA statute of limitations is only four years, which would mean that any claims arising before July 11, 2015 (four years before the initial complaint was filed on July 11, 2019) would be time-barred, unless Plaintiffs were able to find a viable legal ground to toll the statute of limitations. They have now (in their amended complaint) alleged fraudulent concealment as a theory to pursue claims for Prevagen purchases made before July 2015, but Quincy argues that the theory is too vague to succeed. The initial complaint did not include any fraudulent concealment allegations. [ECF No. 1]. The amended complaint was filed after Quincy filed a 20-page motion to dismiss [ECF No. 8], which did not assert the statute of limitations argument. The amended complaint was filed before Plaintiffs responded to the initial dismissal motion (and, of course, before the Court ruled on the motion).

In any event, in the instant motion for class certification, Plaintiffs ask the Court to

(1) grant hybrid certification under Rule 23(b)(2) and (c)(4) for declaratory relief, separately from (b)(3) certification for damages; (2) bifurcate these proceedings into liability and damages phases; and (3) order an expedited trial within 45 days of the decision on certification, to determine whether Quincy's AQ memory representations are false. [ECF No. 54, p. 2].

United States District Judge Marcia G. Cooke referred the class certification motion to the Undersigned. [ECF No. 23]. The Undersigned held a five-hour hearing on the class certification motion. [ECF No. 84].

After Plaintiffs filed their class certification motion, the following submissions were filed:

- Quincy filed three affidavits [ECF Nos. 37-39]

- Quincy filed an opposition response [ECF No. 40]

- Plaintiffs filed an affidavit [ECF No. 47]

- Plaintiffs filed a reply memorandum [ECF No. 54]

- Plaintiff filed two declarations from nonparties [ECF No. 56]

- Quincy filed a Court-permitted sur-reply [ECF No. 58]

- Plaintiffs filed under seal two exhibits from the class certification motion [ECF Nos. 63-64]

- Quincy filed under seal an unredacted version of its opposition response memorandum [ECF No. 65]

- Plaintiffs filed under seal an unredacted version of its reply memorandum and certain exhibits to it [ECF No. 66]

- Plaintiffs filed a notice of supplemental authority [ECF No. 69]

- Plaintiffs filed a declaration [ECF No. 72]

- Quincy filed supplemental authority [ECF No. 75] and Plaintiffs filed an opposition to Quincy's supplemental authority [ECF No. 82]

- Plaintiffs filed supplemental authority concerning fraudulent concealment of the FDUTPA claims and its effect on the statute of limitations [ECF No. 87] and Quincy filed supplemental authority on the same issue [ECF No. 88]

- Quincy filed a supplemental declaration (with 51 exhibits) [ECF No. 90] and a supplemental memorandum [ECF No. 93]

So the class certification motion is fully briefed, to put it mildly.[2]

For the reasons outlined in greater detail below, the Undersigned **respectfully recommends** that Judge Cooke **grant in part and deny in part** the class certification motion. Specifically, the Undersigned recommends that Judge Cooke grant the requested

---

[2]     Plaintiffs also filed a motion for an order to show cause why Quincy and its counsel should not be sanctioned under 28 U.S.C. § 1927. [ECF No. 95]. Quincy filed a response [ECF No. 98] and Plaintiffs filed a reply [ECF No. 102]. As is often the case with sanctions motions, the rhetoric is heated, personal, and vitriol-filled. Plaintiffs' motion accuses Quincy and its counsel of "mak[ing] up facts, mak[ing] up false written and oral misrepresentations to the Court . . . [and] falsely declar[ing] under oath that responsive materials do not exist, when they in fact do." [ECF No. 95, pp. 1-2]. They also contend that Quincy and its counsel have "been coordinating an ongoing pattern of misrepresenting crucial facts to this Court." *Id*. In its response, Quincy says Plaintiffs and their counsel are pursuing a "pattern of attempting to tarnish Quincy's and its counsel's credibility before this Court," describes the sanctions motion as "baseless," and demands that Plaintiffs and their counsel "be held accountable for their reckless and unethical behavior." [ECF No. 98].

       Given this scenario, it seems that counsel will likely not be exchanging holiday cards this season if the current relationship continues unchanged.

Florida-only FDUTPA class -- but only for consumer purchases since July 11, 2015 and more recently. The four-year statute of limitations for FDUTPA claims precludes any type of earlier class certification period, and Plaintiffs have not adequately alleged a fraudulent concealment theory.

Although the amended complaint alleges fraudulent concealment, it fails to allege one of the three required elements. Plaintiffs decided to file their class certification motion before they obtained discovery from Quincy in this case and before they obtained a ruling on the motion to dismiss the amended complaint, so the absence of a required allegation to support a fraudulent concealment theory may well be attributed to the rush to seek certification.

Regardless of why Plaintiffs failed to include a required element, the Undersigned evaluates the class certification motion based on the current record, and Plaintiffs have not alleged all the required elements of a fraudulent concealment theory.  I cannot *assume* that Plaintiffs would be able to factually and ethically assert the third required element in a second amended complaint. They *might* be able to do it in compliance with their obligations under Federal Rule of Civil Procedure 11, but that possibility is, at this point, mere conjecture.

Moreover, limiting the class to those making purchases within the statute of limitations generates another logical consequence: it is somewhat consistent with the factual reality that Prevagen's box and label did not mention memory improvement for

the first few years. The record evidence is that the labels and box started mentioning purported memory improvement benefits in late 2012. Although some of the Prevagen marketing materials and promotions may have also mentioned (in places other than the box and label) improved memory before late 2012, memory enhancement language was not the **primary** focus of Quincy's product-oriented representations (or misrepresentations) and comments about memory did not appear on the boxes and labels until then. Thus, a potential class including purchasers who bought Prevagen before late 2012 would include members who were primarily exposed to *different* representations than those who made purchases after late 2012.

In any event, Plaintiffs have not adequately alleged fraudulent concealment and they have not pointed to record evidence establishing the missing element. Therefore, the statute of limitations prohibits claims for purchases made before July 11, 2015.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### a.  The *Racies* Case

Plaintiffs rely on *Racies v. Quincy Bioscience, LLC*, U.S. District Court for the Northern District of California, Case No. 15-CV-00292-HSG ("*Racies*"), another class action lawsuit filed against Quincy for its AQ-based Prevagen product, because the Court denied in part (and granted in part) a motion to dismiss, denied cross motions for partial summary judgment, and later **certified** a California consumer class (but rejected the request for a nationwide class). At the five-hour hearing in the instant case, Quincy

advised me [ECF No. 94, pp. 3-4] that a California federal jury was recently unable to reach a unanimous verdict, causing the judge to enter a mistrial order in January 2020.

*Racies*, which was filed in 2015 in the Northern District of California, was brought under California's Unfair Competition Law ("UCL") and its Consumers Legal Remedies Act ("CLRA"). *Racies v. Quincy Bioscience, LLC*, No. 15-cv-00292, 2017 WL 6418910, at *1 (N.D. Cal. Dec. 15, 2017) (granting, in part, class certification motion). Similar to the allegations in the instant lawsuit, the plaintiff there alleges that, "contrary to the product's labeling, Prevagen does not improve memory or brain function because its only active ingredient is digested and transformed into amino acids before it can measurably affect the brain." *Id.*

Consistent with the approach used by Plaintiffs here, Plaintiff Racies defines "Prevagen" to include *several* products that he says were marketed as improving memory and supporting healthy brain function.

The *Racies* Court held that Racies met the requirements of Federal Rules of Civil Procedure 23(a) and (b)(3). It certified[3] a class of all California consumers who, **within the applicable statute of limitations period**, purchased one or more of three Prevagen products. The Court excluded two Prevagen products (i.e., Prevagen Extra Strength Chewable and Prevagen Professional Strength) not listed in the complaint, finding that

---

[3]     At a relatively recent hearing in the instant case, defense counsel advised the Undersigned that Quincy had filed a post-trial motion to decertify the class in *Racies.*

the delay in seeking to add them to the litigation was unreasonable and noting that Plaintiff could not add new products through a class certification motion. The *Racies* Court permitted the class to include three products: Prevagen Regular Strength, Prevagen Extra Strength, and Prevagen Mixed Berry chewable.

Concerning the typicality requirement of Rule 23(a)(3), the *Racies* Court rejected the defense argument that Racies is subject to unique defenses and that his claims are not typical because he did not take the product as directed. *Id.* at *2. The Court also was unconvinced by the defense argument that Racies relied on non-actionable representations that Prevagen was "clinically tested," rather than on representations about the potential brain health benefits. *Id.* The *Racies* Court emphasized that Racies also relied on representations about "improving memory" and that it is sufficient if the representation played a substantial part of, and had been a substantial factor in, influencing Plaintiff's decision. *Id.* at *3.

Moving to the predominance requirement of Rule 23(b)(3), the *Racies* Court explained that both the UCL and CLRA require Plaintiff to prove that Prevagen's advertising was either false or misleading. This, the Court held, "is an objective standard, asking whether the representations would be material to a reasonable consumer." *Id.* Quincy, however, contended that common issues could not predominate because there will need to be an individualized determination as to whether class members were exposed to misleading advertisements and whether they relied on those advertisements

in purchasing Prevagen. *Id.*

> To analyze further the predominance factor, the Court first looked to materiality, holding that the challenged representations would be material to a reasonable consumer in making a purchasing decision. *Id.* Next, the *Racies* Court addressed the reliance factor, holding that a plaintiff is entitled to a presumption of reliance if material representations were made to class members. *Id.* at *4. It explained that, "at a minimum, **everyone** who purchased Prevagen would have been exposed to the brain health claims that appeared on its products." *Id.* (emphasis added). The Court then emphasized that "the predominant issue in this case is whether such representations are false or misleading, not whether consumers were also persuaded to purchase Prevagen because these representations were substantiated by clinical testing." *Id.*

> Concerning falsity, the *Racies* Court held that Racies could present commonly-applicable evidence, including his expert's opinion that basic scientific principles show that Prevagen cannot provide the benefits claimed (and that this further supports a finding of predominance). *Id.*

> Analyzing the superiority requirement of Rule 23(b)(3), the Court was not swayed by Quincy's arguments that Prevagen is primarily sold by third parties and that some consumers may be satisfied, but that any dissatisfied consumer could seek a refund. *Id.* at *5. The Court held that the possibility of some difficulty in identifying all class members is not dispositive. *Id.*

Although the *Racies* Court sustained a California class for certain Prevagen purchases made during the statute of limitations, Quincy has now, following the mistrial, filed a motion to decertify the class. *See* ECF No. 94, p. 4. Quincy's decertification motion, to which Plaintiff objects, is now fully briefed and ripe for a ruling from the California District Judge. *See Racies*, ECF Nos. 269; 273; 293.

Quincy raised several grounds for decertification of the California class: (1) Plaintiff is atypical and inadequate because he admitted at trial that he was not exposed to the same brain health benefits as the California class members and therefore is not a member of that Class, (2) individualized issues of reliance predominate in that Plaintiff could not identify the representations that he saw or relied upon when he allegedly purchased Prevagen, (3) Plaintiff failed to set forth any evidence at trial that satisfies his "full refund" damages model, and (4) Plaintiff's counsel is inadequate. *Racies*, ECF No. 269, p. 2.

### b.  The Federal Trade Commission Lawsuit

According to Quincy's motion for a stay pending approval of a nationwide class settlement in related actions, the Federal Trade Commission ("FTC") and the New York Attorney General's ("NYAG") Office filed in federal court a government enforcement action against Quincy in January 2017, asserting violations of the FTC Act, the New York Executive Law, and the New York General Business Law. [ECF No. 48]. Quincy withdrew the motion to stay [ECF No. 52] a day after an FTC attorney wrote a letter to two federal

judges about Quincy's counsel's representations (to the Undersigned and others) about being "close" to reaching an agreement with the FTC and NYAG and that "agreed-to injunctive relief would be announced shortly." [ECF No. 54-2, p. 3].

According to the FTC counsel's letter, "at no time before or since the filing of the FTC/NYAG complaint have the parties been close to agreeing on injunctive relief." *Id.* The FTC attorney also branded as "disingenuous," Quincy's suggestion that judicial action is necessary to "learn the FTC's and NYAG's position with regard to settlement" because both agencies made their positions known in phone calls and a meeting in which Quincy participated. *Id.* at p. 2.

### c.   Other Prevagen-Focused Class Action Lawsuits Against Quincy

As outlined in Quincy's now-withdrawn motion to stay, there are three related putative class actions in the United States District Court for the Southern District of New York: *Vanderwerff v. Quincy Bioscience Holding Co.*, No. 1:19-cv-7582-RA ("*Vanderwerff*"); *Karathanos v. Quincy Bioscience Holding Co.*, No. 1:19-cv-8023-RA ("*Karathanos*"); and *Spath v. Quincy Bioscience Holding Co.*, Inc., No. 1:19-cv-3521-RA ("*Spath*") (collectively, the "SDNY Actions"). In addition, Quincy is also involved in another Prevagen-related lawsuit in the Western District of Texas: *Engert v. Quincy Bioscience, LLC*, No. 1:19-cv-00183-LY (W.D. Tex.). And, as noted, *Racies* was tried by a jury from January 6 through January 14, 2020, after which the presiding judge declared a mistrial due to jury deadlock. [ECF No. 106, p. 2, n. 1].

13

### d.  The Parties' Factual Contentions

#### i.  <u>Plaintiffs' Allegations</u>

In the instant case, Plaintiffs claim that several products are at issue: Prevagen Regular Strength Capsules (10 mg. AQ), Prevagen Regular Strength 60 Capsules (10 mg. AQ), Prevagen Extra Strength Capsules (20 mg. AQ), Prevagen Mixed Berry Chewable (10 mg. AQ), Prevagen Extra Strength Chewable (20 mg. AQ), and Prevagen Professional Strength (40 mg. AQ). According to their class certification motion, Plaintiffs refer to the products **collectively** as Prevagen because "in a real sense, the 'product' at issue in this case is AQ, which the evidence will show is equally and uniformly ineffective across all varieties of Prevagen such that Plaintiffs and class members have all suffered the same injury regardless of which variety of Prevagen they purchased." [ECF No. 21, p. 1, n. 2].

As alleged in the class certification motion, Quincy uniformly advertises the presence of its unique protein, AQ, on every bottle of Prevagen. Further, based on this protein, Quincy represents that "Prevagen improves memory" on the front page of its website, in every print, internet, and television advertisement, and on the front of every bottle of Prevagen -- where it cannot be missed by consumers. *Id.* at p. 3.

Quincy further represents on the front of every Prevagen package label that Prevagen "supports" "Healthy Brain Function," "Sharper Mind," and "Clearer Thinking." *Id.* On the back of every Prevagen label, Quincy further represents that Prevagen "helps with mild memory problems associated with aging" and "improves

memory within 90 days." *Id.* Plaintiffs refer to these representations as the "Apoaequorin **Memory** Representations." *Id.* (emphasis added). Their amended complaint contends that Quincy, for more than a decade, has "uniformly marketed Prevagen nationwide as being designed for one purpose: 'Prevagen Improves **Memory**.'" [ECF No. 15, p. 1 (emphasis added)].

Thus, although the "Apoaequorin Memory Representations" include representations about brain function and the mind (generally), the primary point of Plaintiffs' lawsuit is that Quincy's overarching theme is that Prevagen purportedly **improves memory**. In fact, Plaintiffs' reply contains a section entitled, "Quincy's Apoaequorin Memory Representations Convey the Overarching Theme that 'Prevagen Improves Memory.'" [ECF No. 54, p. 3].

Plaintiffs contend that the question of whether AQ provides the advertised memory benefits is a common and predominant question of fact equally applicable to every class member and susceptible to classwide proof. They say that the evidence will include several of Quincy's own studies which admit that AQ is "rapidly digested by the body which results in Prevagen not providing memory benefits." [ECF No. 21, p. 4]. Moreover, they allege that the opinion testimony of two experts will confirm that the product does not do (and cannot do) what it purports to do.

Because Quincy's representations are false, Plaintiffs say, the product is **worthless.** Thus, the damages are the purchase price, and all class members were uniformly injured

when they purchased Quincy's worthless Prevagen product and incurred a monetary loss.

Plaintiffs also say that class members can be easily identified; and their damages can be calculated on a classwide basis by using pricing and sales data maintained by Quincy, retails sales data from third parties (such as Costco and Walmart), and self-identification of class members and their purchases.

Plaintiffs contend that all Florida consumers who purchased Prevagen were "exposed to the **uniform . . . [r]epresentations**" about memory and brain function that were "objectively likely to mislead." *Id.* at p. 6 (emphasis supplied).

### ii.  Quincy's Defense Position

At bottom, Quincy says this case is not appropriate for class treatment, and it asserts myriad arguments to support this position. It also challenges the science underlying the lawsuit and points to the Madison Memory Study (which Plaintiffs refer to in their amended complaint) as substantive support for its marketing statements.

The Madison Memory Study ("MMS") is, according to Quincy's motion to dismiss, a 90-day, randomized, double-blind placebo-controlled study which "fully substantiates" the marketing statements about Prevagen. [ECF No. 25, p. 8].[4]  The MMS was designed

---

[4]     Quincy attached a copy of the MMS to its motion to dismiss. [ECF No. 25-2]. The report contains an August 1, 2016 report date, with study dates of December 3, 2009 to April 13, 2011. Kenneth C. Lerner, identified as being associated with Quincy, is the principal investigator. The Madison Memory Study occurred in Madison, Wisconsin.

"to determine whether Prevagen with apoaequorin (10 mg.) improves quantitative measures of cognitive function in community dwelling, older adults." *Id.* In addition, the MMS involved 218 adults aged 40 to 91, each with self-reported memory difficulties, who were randomly assigned to receive either an AQ capsule or a placebo. According to Quincy's motion to dismiss, the MMS results showed "statistically significant improvements as compared to placebo recipients" for "otherwise healthy adults with mild, but not severe, memory impairment." *Id.* at p. 4.

Quincy's dismissal motion further contends that the MMS study "concluded that 'Prevagen demonstrated the ability to improve aspects of cognitive function in older participants with either normal cognitive aging or very mild impairment, as determined by AD8 screening.'" *Id.* at p. 5. Therefore, Quincy says, Plaintiffs' claim that the MMS supports their claim against it under FDUTPA and for unjust enrichment is "wrong, baseless and belied by the actual results of the Madison Memory Study." *Id.*

In response, Plaintiffs argue that *Racies* rejected Quincy's theory that the MMS showed that the scientific evidence is equivocal. The *Racies* Court held that "the mere existence of an expert or experts who support the defendant's representations should not insulate a defendant from false advertising claims or foreclose class certification." *Racies*, 2017 WL 6418910, at *4.

Additionally, in further support of their class certification motion, Plaintiffs submitted the expert report of Dr. Robert Speth, a pharmacologist and neuroscientist.

[ECF No. 47-1]. Dr. Speth opined that "the claim made by Quincy Bioscience that a clinical trial proved that Prevagen improved memory is a false claim." *Id.* at p. 10.

In reaching this conclusion about the MMS,[5] Dr. Speth had myriad critical comments to make. First, he highlighted that "the data presented in this paper indicate that **people with self-reported memory problems likely performed worse when taking Prevagen**, while only a subgroup of the subjects, who did not have self-reported memory problems, were reported to have improvements in memory when taking Prevagen." [ECF No. 47-1, p. 11 (emphasis in original)].

Noting that "there are unexplained missing data for subject" in the subgroup, Dr. Speth also had other concerns over the MMS's reliability: (1) "[b]y not reporting the results for all of the individuals in their published study, the study cannot be considered to provide documentation of memory improvement, even in the subjects who were least likely to have a need for a memory-enhancing drug"; (2) "[a] further limitation to the

---

[5]     Dr. Speth did not *expressly* refer to the published data as the "MMS" report, and he did not mention MMS or Mr. Lerner in the text of his report. Instead, he referred to Quincy's "own published data" as "Moran et al., 2016." [ECF No. 47-1, p. 11]. The References portion of his report lists Mr. Lerner as a co-author of the Moran report, with the title "Effects of a Supplement Containing Apoaequorin on Verbal Learning in Older Adults in the Community." *Id.* at p. 12. The Dr. Speth References page notes that the study was published in "Adv Mind Body Med 30: 4-11." *Id.* This appears to be Dr. Speth's shorthand reference to a journal entitled "Advances in Mind-Body Medicine." *Id.* at p. 11. The title of Quincy's self-published study is strikingly similar: "Madison Memory Study: A Randomized, Double-Blinded, Placebo-Controlled Trial of Apoaequorin in Community-Dwelling, Older Adults." [ECF No. 25-2]. Thus, it seems extremely likely (and almost a certainty) that Dr. Speth's comments about the Moran study were in fact about the Madison Memory Study which Quincy submitted with its motion to dismiss.

validity of the claims that Prevagen improves memory in this study is the authors' failure to correct for multiple comparison bias"; (3) the authors, all of whom were "associated with Quincy," did multiple tests of memory and only a small proportion of those tests were claimed to be statistically significant; (4) "[w]hen a significance level is set to a 5% probability of error, and 20 tests are run, the likelihood that one of those tests will attain statistical significance by chance is very high"; and (5) "[t]he proper statistical analysis would control for this increased likelihood of a false positive result, however, the study published by Quincy Bioscience researchers in Advances in Mind-Body Medicine did not use such a statistical analysis." *Id.*

This Report and Recommendation will not, however, determine which of the competing scientific perspectives about the MMS should be relied upon or which is the correct one or the more-persuasive one. Instead, it will focus on the class action factors and the evidence relied upon by the parties. Therefore, I will now return to a discussion of Quincy's defense opposition to the class action motion and its reliance on certain circumstances.

Quincy notes that the "vast majority" of Prevagen's current sales are made to authorized brick-and-mortar and online retailers. [ECF No. 40, p. 2]. Some sales are to healthcare professionals, for resale to individual consumers, while other sales are to institutional pharmaceutical distributors (such as Cardinal Health). Still other Prevagen sales are made directly to consumers through Prevagen's website or over the telephone.

Quincy says it has no way of identifying consumers who purchased Prevagen from independent third-party retailers, healthcare professionals, or through pharmaceutical distributors.

In addition, Quincy notes that not all consumers pay the same retail price for Prevagen products, explaining that some sellers use the minimum retail price suggested by Quincy, while others do not. Moreover, Quincy says that some retailers offer myriad promotions which result in Prevagen being sold below the minimum retail price, including automatic shipping discounts, bulk pricing, coupons, and rebate programs.

Quincy further contends that a number of unauthorized retailers sell products online which are marketed and sold as Prevagen. These products, Quincy says, might be stolen goods. According to Quincy, Prevagen-branded products sold by unauthorized retailers and re-sellers are typically sold at prices which are "deeply discounted from those charged by authorized retailers." *Id.* at p. 3. Quincy says there is no way for it to identify consumers who purchased Prevagen from unauthorized sellers.

Because this lawsuit concerns representations (or, to be more accurate, alleged *misrepresentations)* in labels and on boxes about the so-called memory-improvement benefits of Prevagen, Quincy emphasizes that "the labeling and packing of Prevagen has changed drastically over time." *Id.* For example, when Prevagen was first introduced for sale in 2007, the front of Prevagen's packages and labels used the product descriptor "Jellyfish Fight Aging." *Id.* at p. 4. Beginning in 2008, Prevagen labels used the descriptor

"Brain Cell Protection." *Id.* Beginning in 2010, Prevagen labels used the descriptor "Clearer Thinking." *Id.* In late 2012, the packaging and labeling of Prevagen was modified again to include the descriptor "Improves Memory" based, in part, on the results of the MMS. *Id.* In Fall 2016, Vitamin D3 was added to all Prevagen products and their packages and labels were revised accordingly. *Id.*

Continuing with the same approach of highlighting differences between the representations, Quincy notes that, starting in 2008, certain Prevagen products were also sold with a package insert. *Id.* The language in this package insert changed multiples times between 2008 and the present. *Id.*

Therefore, Quincy argues that the "central premise" of Plaintiffs' motion -- that "Prevagen has been 'uniformly marketed' with the phrase 'Improved Memory'" -- is not true. *Id.* at p. 15. The reason why the core theory is not true, Quincy says, is that "the labels on the various Prevagen products changed drastically over time." *Id.* Therefore, Quincy argues, individual factual issues predominate because "falsity and causation will have to be proven separately for each of the challenged marketing claims, resulting in individualized inquiries that predominate over any common questions." *Id.*

More specifically, Quincy asserts that "the 'Improves Memory' language that is central to Plaintiffs' claims w[as] **not used until <u>late 2012</u>**." *Id.* at p. 19 (emphasis added). Consequently, Quincy contends, "***any*** consumer who purchased Prevagen prior to ***that*** time [i.e., "late 2012"] could not have suffered any alleged injury ***regarding that statement***

[i.e., "improves memory"] and should be excluded from the class." *Id.* (emphasis added).

At the five-hour hearing on the class certification motion, it became apparent that Quincy's representations about Prevagen's effect on memory loss changed over time and may not have included *any* representations expressly mentioning memory (or memory loss) for the first few years of the product's history. Because Plaintiffs are seeking to certify a class of Florida consumers who made Prevagen purchases in 2007 (when product sales began) and at all times thereafter, a significant difference in the representations over time could directly impact the class action assessment.

For example, if a 2007 purchaser was never exposed to marketing language or advertisements mentioning memory loss, but a 2017 purchaser saw several references highlighting purported memory improvement, it might not be appropriate to certify those types of purchasers in the same class action lawsuit.

Given this potential scenario, the Undersigned directed Quincy to submit a declaration outlining the circumstances between 2007 and 2011 where its Prevagen marketing used the terms "memory," "improving memory," "memory enhancement," or any other phrase mentioning or referring to improving memory or minimizing memory loss. [ECF No. 86]. Quincy complied by filing the declaration of Todd Olson, Quincy's Market Development Director since 2018. [ECF No. 90]. The declaration is 13 pages long, and it is accompanied by 229 pages of supporting exhibits.

In his declaration, Mr. Olson disclosed instances of marketing and advertising

which **do** in fact mention memory *before* late 2012. Mr. Olson's declaration discussed Prevagen's labeling and its advertising and marketing (including infomercials and call centers, health conferences and visits to supplement stores, short-form radio advertisements, guest appearances on radio shows, print advertisements, direct to retailer advertisements, press releases, and a publication titled, "The Brain Health Guide," which was given to consumers when they purchased Prevagen over the phone or on the Prevagen website). *Id.* The **2010** version of this guide (which is obviously well before "late 2012") includes the following statement: "Prevagen, an all-natural supplement containing calcium-binding proteins, has been shown to **improve memory** and protect the brain by keeping brain cells alive longer." *Id.* at pp. 11-12 (emphasis added).

Quincy has represented to the Court that the "improves memory" product descriptor was introduced in 2012. However, a label and carton introduced in **2008** state: "as we age we lose calcium-binding proteins that protect our brain cells. This protein loss affects our ability to learn, **retain memories**, think and concentrate." *Id.* at p. 3 (emphasis supplied). And the single facing carton also states: "Healthier Brain" and "Protects Memories." *Id.* A label for "Prevagen Professional" first available in approximately *April 2009* states that the product "is for **memory problems** that occur with aging." (emphasis added).

According to the recent Olson Declaration, Quincy located scripts which "*might*"

have been used at a call center or in an informercial but is unable to determine whether they were actually used, and, if so, when and where they were used. *Id.* at pp. 5-6. An infomercial script disseminated during a two-week period in late 2007 or 2009 [well before "late 2012"] included the following statement: "cellular health means you look and feel better and function, think and **remember better.**" *Id.* at p. 5 (emphasis added).

Similarly, a script used on a PBS show in approximately ***2007*** said, "Without an adequate supply, **memory** suffers and good mood and sense of well-being can sink." *Id.* (emphasis added). And an undated copy of a radio show infomercial script includes the following statement: "Scientists have made the surprising discovery that's helping thousands of people **improve their memory**, their focus and their ability to concentrate." *Id.* (emphasis added).

The Olson Declaration also discusses an undated copy of a script which says, "Lose a cell **lose a memory**." *Id.* (emphasis added). It also mentions an undated call center script which says, "Most people call us because they are experiencing problems with concentration, **memory** and focus." *Id.* at p. 6 (emphasis added). Another undated call center script with the title "Request to Cancel Dialogue" includes the following statement: "We all want a better **memory** and clearer thinking right away, but Prevagen reacts a little differently with everyone and sometimes it takes a little longer to work." *Id.* (emphasis added). And another undated call center script entitled "Order Capture" includes the following statement: "You probably remember when your brain was completely healthy.

You had no problems with your **memory**, you could concentrate for long hours and you never felt like you were in a mental fog. Prevagen helps with a healthy brain." *Id.* (emphasis supplied).

Mr. Olson also referred to an undated advertisement or flyer which *might* have been used at a conference or at a store. That ad or flyer says: "Do You or a Loved One Experience **Memory Loss**?" *Id.* at p. 7 (emphasis added). A radio commercial script dated July 16, 2008 includes the following statement: "Do you sometimes experience **memory problems**?" *Id.* (emphasis added). Likewise, an August 31, 2009 radio commercial script says, "Prevagen, that's spelled P-R-E-V-A-G-E-N, is a non-prescription, all-natural supplement that can **help you with your memory** and make you sharper and more focused." *Id.* (emphasis added). And an undated radio commercial script includes the following statement: "Thousands of people using Prevagen have already reported **improvements in their memory** and clearer thinking." *Id.* (emphasis added). Another undated radio commercial strip includes the following statement: "Well, there's a non-prescription, natural product called Prevagen that can **actually help you with your memory** and make you sharper and more focused." *Id.* at p. 8 (emphasis added).

Many of the print ads mentioned in the Olson Declaration do not have dates. Nevertheless, the ads contain at least one of the following statements: "protect your **memory** and feel younger"; "**better memory**"; "Scientists discover 'gift from the sea' that fights brain cell aging in adults"; "ocean protein **boosts memory**, focus and

concentration, say researchers"; "can a simple sea protein hold the key to **preserving your memory?**"; "these proteins protect the cells that are responsible for learning and **memory, clear thinking and concentration**"; "Prevagen is able to improve cognitive function for people who are experiencing **memory difficulties**"; "calcium and **memory** . . . what's the connection"; "Ken [R.] of New York City just finished his first bottle of Prevagen and already 'noticed a big difference in my **memory** thought process'"; "improved **memory** for confidence"; and "Prevagen **Improves Memory in 30 Days**." *Id.* at pp. 9-11 (emphasis added).

As outlined in the Olson Declaration, Quincy also advertised directly to retailers, usually in the form of leaflets or flyers. The declaration refers to a series of undated flyers or advertisements which include the following statement: "Prevagen is the key to **staving off** the potentially devastating effects of decreased brain function and the onset of **memory loss** that many people begin to experience as they age." *Id.* at p. 11. (emphasis added).

By way of overall summary, it seems clear that Quincy at least prepared and used *some* marketing materials mentioning memory or the concept of "remembering" since 2007, even though the specifics of those representations changed over the years and even though they may not have been the *primary* marketing message. Thus, although Quincy contends that the "improves memory" descriptor was introduced in 2012 and that the "improves memory" phrase was not used until "late 2012," materials prepared and used

*years* earlier did in fact include statements referring to memory.

This inconsistency -- between what Quincy initially represented and argued about its marketing and advertising materials and its later disclosures made because my Order required a more-detailed history -- is one of the reasons that Plaintiffs' motion for a show cause order for sanctions against Quincy and its attorneys is still pending. Plaintiffs accuse Quincy and its counsel of "coordinating an ongoing pattern of misrepresenting crucial facts" and making representations, including many under oath, which are "demonstrably false." [ECF No. 95, pp. 1-2]. Plaintiffs' motion contends that "there is simply no good faith basis for Quincy or its counsel to deny that the overarching message of Quincy's advertising of Prevagen is, and always has been, that Prevagen can improve your memory." *Id.* at p. 11.

Quincy opposes the motion for a show cause order and argues that Plaintiffs' motion "fails to identify any 'false statements' made by Quincy." [ECF No. 98, p. 1]. It argues that Plaintiffs' first amended complaint focuses on Prevagen's *labels* and that Quincy's response was designed to specifically rebut the central argument about the "improves memory" phrase on the label. *Id.* at p. 3. Thus, Quincy explained, the declaration it submitted attached representative samples of various **labels** which had changed over time. The declaration, Quincy contends, "made no representation regarding *other* marketing material because Plaintiffs had not identified any such marketing material as a basis for certifying a class." *Id.* at p. 9 (emphasis added).

On the other hand, Quincy's response to the class action motion was not limited to the representations on the labels. Instead, the initial opposition discussed the "labeling *and* packaging" of Prevagen, along with an explanation that both "changed drastically over time." [ECF No. 40, p. 4 (emphasis added)]. This response also discussed a package insert, which is different than the label.

In any event, regardless of (1) what specific representations were made about the connection between Prevagen and memory from 2007 to date; (2) how the precise language changed; (3) where, specifically, the representations were made (e.g., labels, packages, inserts, displays, or advertising); and (4) what representations (or misrepresentations), if any, were made to this Court by Quincy and its counsel, Prevagen products do not have any expiration dates. Thus, Quincy contends, it is likely that different versions of otherwise identical Prevagen products were available for sale at the same time, and perhaps even at the same Florida retail locations, with different labeling, packaging and package inserts

Quincy also argues that neither of the two Plaintiffs is an adequate class representative. Collins alleges that he purchased Prevagen Extra Strength once in the Summer of 2017 at a Walgreens pharmacy in Florida for his sister. Collins never ingested Prevagen himself. He was aware that a condition his sister had is actually a disease when he purchased Prevagen, and he admitted that he read the statement on the Prevagen label that the product is "not intended to diagnose, treat cure or prevent any disease." [ECF

No. 40, p. 3].

Although Collins alleges to have been exposed to Quincy's representations about Prevagen's memory benefits, he could not at his deposition describe those advertisements with any specificity. He did not visit the Prevagen website.

The other Plaintiff, Fowler, said that he purchased Prevagen at Walgreens and online from eBay over the last year. His purchases included at least one bottle of Prevagen from Walgreens and four bottles of Prevagen Regular Strength capsules (60 count) at $27.99 per bottle from eBay.com in May 2019.

Fowler claims that "[p]rior to purchasing Prevagen, [he] was exposed to and saw Quincy's memory improvement representations by reading the Prevagen labels, as well as other advertisements, including television, internet, and print advertisements." *Id.* at p. 5. In his declaration in support of class certification, Fowler testified that the "marketing materials [he] viewed were uniform and made no distinction between any variety of Prevagen." [ECF No. 21-7, ¶ 2]. According to Quincy, despite this sworn statement in his declaration, Fowler could recall almost no information about the marketing material that he allegedly viewed when asked about it during his deposition just one month after his declaration was submitted.

Moreover, Fowler testified that he purchased Prevagen *before* reading the Prevagen label and did not read the entirety of the box when he first purchased Prevagen at Walgreens.

Therefore, Quincy argues, that the claims of Collins and Fowler are atypical. Collins, it says, did not behave as a reasonable consumer and Fowler did not purchase Prevagen for mild memory problems associated with aging. Moreover, Fowler purchased the product before reading the label.

Quincy also argues that both Plaintiffs lack basic knowledge of the case, further undermining their adequacy. For example, Quincy points out that Fowler met with his lawyers for the very first time the day before his deposition, spoke to them only once or twice on the telephone before meeting them, was not aware of any scientific studies or literature about Prevagen or AQ, and did not know the status of the case. Collins, on the other hand, did not know the name of the expert he retained, did not read any expert reports, and is not aware of any study involving Prevagen.

Quincy contends that *Racies* is inapposite because it involves different legal claims and because it involves "an entirely different body of science than what Plaintiffs present here in connection with the Madison Memory Study, which refutes Plaintiffs' conclusory allegations of falsity." [ECF No. 40, p. 6]. It also argues that *Racies* is inapposite for another reason: the California district court found predominance under two California state statutes, neither of which is at issue here. Moreover, it highlights that *Racies* was decided after the parties there developed a discovery record, a scenario not present here (because Plaintiffs filed the class certification motion soon after filing the lawsuit and before obtaining full discovery in this case).

## II.    APPLICABLE LEGAL STANDARDS

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (citation omitted). "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 564 U.S. at 350.  "In other words, 'the party seeking class certification has a burden of *proof*, not a burden of pleading.'" *Reyes v. BCA Fin. Servs.*, No. 16-cv-24077, 2018 WL 3145807, at *7 (S.D. Fla. June 26, 2018) (quoting *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016)).

In evaluating compliance with Rule 23, courts begin by determining "whether the proposed class has been adequately defined and is ascertainable." *Reyes*, 2018 WL 3145807, at *9.  Courts next consider whether a plaintiff satisfies Rule 23(a)'s prerequisites: numerosity, commonality, typicality, and adequacy. The class must also satisfy one of the three additional requirements of Rule 23(b).

Here, Plaintiffs assert a class under Rule 23(b)(3), [ECF No. 21, p. 10], which provides that certification is available if a court finds "the questions of law or fact common to class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). "The predominance inquiry . . . is 'far more demanding' than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (citation omitted).

### a. Standing

Article III standing requires a plaintiff to have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo v. Robbins*, 136 S. Ct. 1540 (2016). To establish "injury in fact," a plaintiff must show that he or she suffered an "'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). For the injury to be "concrete," it must be "real" and not abstract; however, it need not be tangible. *Id.*

These principles apply to class actions. "[I]t is well-settled that prior to the certification of a class . . . the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). "Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a) to assert the rights of others." *Id.* at 1280 (internal citation omitted). Thus, district courts have addressed class

plaintiff standing early in litigation -- before a motion for class certification having been filed. *See, e.g., Weiss v. General Motors LLC*, No. 19-cv-21442-RNS, 2019 WL 5394621, at *3 (S.D. Fla. Oct. 22, 2019).

### i. "Products" Purportedly Not Purchased

Plaintiffs contend that the product at issue is AQ itself, which, they argue, is "equally and uniformly ineffective across **all varieties** of Prevagen such that Plaintiffs and class members have all suffered the same injury regardless of which variety of Prevagen they purchased." [ECF No. 21, p. 1, n. 2 (emphasis added)].

But Quincy argues that this theory is "a fiction designed to distract the Court from the obvious lack of standing." [ECF No. 40, p. 19]. According to Quincy, Plaintiffs lack standing for all varieties of the Prevagen product other than "Prevagen Extra Strength" (for Collins) and "Prevagen Regular Strength" (for Fowler). Therefore, Quincy says, four of the six products included in the claim cannot be pursued by these two named Plaintiffs because they lack standing.

As recently noted in *Weiss v. General Motors*, "there is some uncertainty or disagreement in the law on the issue of whether a plaintiff can assert claims on behalf of class members that purchased different products based on a theory that the products are essentially the same." *Weiss v. General Motors*, No. 19-21552, 2019 WL 5394621, at *3 (S.D. Fla. Oct. 22, 2019) (internal citation omitted); *see also Snyder v. Green Roads of Florida LLC*, No. 19-cv-62342, 2020 WL 42239, at *3 (S.D. Fla. Jan. 3, 2020) (noting authority which

afford a class action plaintiff standing based on products he or she did not purchase "so long as the products and alleged misrepresentations are substantially similar"); *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1336, 1373 (S.D. Fla. 2015) (noting a "split" on the standing issue regarding unpurchased products in the district courts); *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1392-93 (S.D. Fla. 2014) (acknowledging "there is authority going both ways" and noting that it finds "persuasive arguments supporting both positions"); *Amin v. Mercedes-Benz USA, Inc.*, 301 F. Supp. 3d 1277, 1283 (N.D. Ga. 2018) (noting "disagreement among federal courts" on this issue).

In *Carter v. Forjas Taurus, S.A.*, 701 F. App'x 759, 762 (11th Cir. 2017), the Eleventh Circuit affirmed an order approving a settlement in a putative class action brought by a sheriff's deputy against a gun manufacturer. The class-representative deputy sheriff had bought only a single model of the nine models of guns at issue, but the Eleventh Circuit held that he had **standing as to the other models**. *Id.* at 765. The Eleventh Circuit emphasized that the class representative alleged that he owned a class gun "which suffered from the same defects as the rest of the class guns." *Id.* Therefore, the Eleventh Circuit held, he "suffers from the same alleged injury as the rest of the class." *Id.* The Court further explained, "we discern no other standing defects." *Id.*

Although *Forjas Taurus* is not binding because it is an unpublished opinion, it is persuasive. Moreover, because it is an appellate decision, the Undersigned deems the case to be more persuasive than non-binding district court opinions, such as *Green Roads*.

In addition, other district courts have relied upon *Forjas Taurus* when evaluating standing challenges based on the purchase of potentially different products.

For example, the plaintiffs in *Amin* brought a putative class action against the vehicle manufacturers for alleged defects in the air conditioning (HVAC) systems of several vehicles. *Amin*, 301 F. Supp. 3d at 1281. The vehicles at issue were 15 different models, with model years ranging from 1999 to 2017. *Id.* at n.1. Plaintiffs alleged that the defect in the HVAC Systems of the class vehicles is one of design. *Id.* at 1281.

Not surprisingly, Defendants challenged Plaintiffs' standing to represent absent class members for models they did not purchase. *Id.* at 1283. Ruling on a motion to dismiss, the *Amin* Court noted that *claims* is the subject which "really matters" and explained that "in a real sense, the 'product' at issue in this case is a faulty HVAC System, which Plaintiffs have alleged is the **<u>same</u> across all Class Vehicles**." *Id.* at 1284 (emphasis added). After citing *Forjas Taurus*, the *Amin* Court denied the motion to dismiss for class vehicles not purchased by the named plaintiffs because the HVAC systems in the identified models they did purchase "suffered from the **same defects** as the rest of the models." *Id.* at 1284-85 (emphasis added).

In the instant case, Plaintiffs did more than simply *allege* that the different Prevagen products are actually the same product. Instead, they submitted testimony they obtained from Quincy executives in depositions taken in the instant case which represented that although the doses and delivery formats for Prevagen might be different,

AQ is the identical active ingredient in *all* Prevagen products. [ECF No. 66-1, p. 3].[6] Keith Thomsen, Quincy's CFO, testified that the products are "identical that they have the active ingredient in them, yes." [ECF No. 66-6, p. 9]. He also conceded that the only differences between the products was "just in terms of the strength or the size of the pill." *Id.*

Because Plaintiffs have submitted competent evidence (as opposed to mere allegations) to demonstrate that the alleged defect is uniform across the myriad Prevagen products, the Undersigned finds that they have standing to represent other class members who purchased other varieties of the Prevagen product. *See Weiss*, 2019 WL 5394621, at *4 (denying motion to dismiss concerning a Florida class of General Motors vehicles with allegedly defective drivelines often referred to as the "Chevy Shake," rejecting defense argument that plaintiff lacks standing to sue for consumers who purchased vehicles other than the 2015 Chevrolet Silverado 1500, and explaining that discovery would reveal whether GM used the "same drive shaft in these vehicles over different model years and types").

### b.  Do the Merits Matter on a Class Certification Issue?

While a court may *consider* the factual record in connection with the class-certification requirements, a comprehensive, substantive analysis of the merits of claims

---

[6]    Although Plaintiffs filed the relevant testimony and portions of their reply under seal, Quincy later advised the Court that it is no longer asserting confidential under-seal treatment for these specific submissions. [ECF No. 104].

or defenses is inappropriate on class certification. Fed. R. Civ. P. 23(c)(1)(A) advisory committee's note to 2003 amendment ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision."); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."); *Drayton v. W. Auto Supply Co.*, No. 01-CIV-10415, 2002 WL 32508918, at *6 (11th Cir. Mar. 11, 2002); *Reyes*, 2018 WL 3145807, at *7. The purpose of a class-certification ruling "is not to adjudicate the case," but "to select the method best suited to adjudication of the controversy." *Amgen*, 568 U.S. at 460 (internal citation omitted). Adjudicating the merits to determine certification "put[s] the cart before the horse." *Id.*

However, this overall philosophy does not mean that elements of the claims or defenses are completely *irrelevant* to class certification. Instead, the analysis is limited to whether they are subject to common or individualized proof, not whether a particular claim or defense will ultimately be *successful.* Indeed, the Eleventh Circuit recently held it is an abuse of discretion to deny certification based on a "defense [that] raised a question common to all class members." *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 41 F.3d 1031, 1041 (11th Cir. 2019).

The issue on class certification is not whether a claim or defense will *succeed,* but whether the substantive theories are subject to common proof, and, if not, whether it will

require "a great deal of individualized proof." *Id.*; *see also id.* at 1042 ("We caution that we express no opinion today about whether Rushmore's defense is meritorious . . . Our decision today is limited to the conclusion that this defense raises questions common to all class members.").

Framed by this language, the Undersigned notes that "if a question of fact or law is relevant to that determination, then the district court has a **duty** to actually decide it and not accept it as true or construe it in anyone's favor." *Brown*, 817 F.3d at 1234 (emphasis added). Here, the "rigorous analysis" required by Rule 23 "will entail some overlap with the merits of the plaintiff's underlying claim" because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Dukes*, 564 U.S. at 351-52 (citation omitted).

For example, the proposed class definition will necessarily become embroiled in analysis of whether Plaintiffs' proposed class can include Prevagen consumers making purchases as far back as 2007, as opposed to July 2015 and thereafter.

Accordingly, it is appropriate to consider the merits of Plaintiffs' claims to the extent those issues are relevant to determining whether Plaintiffs have met their burden to show that class certification is warranted. But the Undersigned will analyze merits issues "only to the extent [] they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Reyes*, 2018 WL 3145807, at *7.

### c. The FDUTPA Statute of Limitations

Plaintiffs seek class certification only on the FDUTPA claims; they are not seeking certification on the unjust enrichment claim in Count III. FDUTPA claims are subject to a four-year statute of limitations, but Plaintiffs have argued for a tolling of that statute because of "fraudulent concealment tolling," a concept they discuss in a three-paragraph section in the first amended complaint.

Analyzing the statute of limitations does, to be sure, involve the merits, but it is the type of evaluation which the Undersigned must do because the result will determine whether the class dates back to 2007 purchases (if the tolling argument succeeds) or if the class dates back to July 11, 2015 (four years before the first version of the complaint was filed in this case). For reasons explained below, the Undersigned is recommending that Judge Cooke grant the class certification motion, so I need to determine the class period (i.e., back to 2007 or no earlier than July 11, 2015 or some other date). This determination requires me to determine if Plaintiffs have adequately alleged that the four-year statute of limitations was tolled because of alleged fraudulent concealment.

Because Plaintiffs' FDUTPA claims against Quincy are founded on a statutory liability, it is subject to a four-year statute of limitations. Fla. Stat. § 95.11(3)(f). "It is axiomatic that under Florida law, a cause of action accrues, for statute of limitations purposes 'when the last element constituting the cause of action occurs.'" *In Re Bldg. Materials Corp. of Am. Asphalt Roofing Products Liab. Litig.*, No. 8:11-CV-02785, 2013 WL

139520, at *10 (D.S.C. Jan. 10, 2013) (analyzing Florida law on fraudulent concealment

theory concerning challenge to FDUTPA claim as being time-barred) (citing *New Lenox

Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 906 (M.D. Fla. 2007) and Fla. Stat. § 95.031(1)).

A FDUTPA claim accrues "at the time of purchase or lease of a product, not upon

discovery of an alleged defect." *Speier-Roche v. Volkswagen Grp. of Am. Inc.*, No. 14-20107-

CIV, 2014 WL 1745050, at *6 (S.D. Fla. Apr. 30, 2014) (citing *Matthews v. Am. Honda Motor

Co., Inc.*, No. 12-60630-CIV, 2012 WL 2520675, at *4 (S.D. Fla. June 6, 2012)).

"As a general rule, fraudulent concealment constitutes an implied exception to the

statute of limitations, postponing the commencement of the running of the statute until

discovery or reasonable opportunity of discovery of the concealment by the owner of the

cause of action." *S.A.P. v. State, Dept. of Health and Rehab. Servs.*, 704 So.2d 583, 585 (Fla.

1st DCA 1997).

Although not specifically enumerated in Florida's general tolling statute, *see*

Florida Statutes § 95.051, fraudulent concealment is widely accepted as an equitable basis

for tolling a statute of limitations under Florida law. *See Berisford v. Jack Eckerd Corp.*, 667

So. 2d 809 (Fla. 4th DCA 1995) (finding that fraudulent concealment could toll the statute

of limitations in a wrongful death action despite the lack of a statutory exception); *Vargas

By and Through Vargas v. Glades General Hosp.*, 566 So. 2d 282 (Fla. 4th DCA 1990) (internal

citation omitted) ("Fraudulent concealment as an exception to the statute of limitations

has as its philosophy that courts will not protect defendants who are directly responsible

for the delays of filing because of their own willful acts.").

"To establish fraudulent concealment sufficient to toll the statute, the plaintiff must show both successful concealment of the cause of action and a fraudulent means to achieve that concealment." *S.A.P*, 704 So. 2d at 585. "[A] party seeking to avail itself of the doctrine of fraudulent concealment must have **exercised reasonable care and diligence** in seeking to learn the facts which would disclose the fraud." *Berisford*, 667 So. 2d at 812 (emphasis added); *see also Razor Capital, LLC v. CMAX Fin. LLC*, No. 17-80388-CIV, 2017 WL 3481761, at *4 (S.D. Fla. Aug. 14, 2017) (analyzing Florida law on fraudulent concealment exception to the statute of limitations and denying motion to dismiss FDUTPA claim as time-barred where plaintiff alleged defendant fraudulently concealed material defects in the loan portfolio defendant sold to plaintiff).

To qualify as fraudulent concealment, a defendant's conduct must occur after the plaintiff's cause of action has already accrued. *In re Engle Cases*, Case No. 09-cv-10000, 2012 WL 12904243, at *5 (M.D. Fla. Nov. 26, 2012) (requiring "an affirmative act that served to dupe, trick or hoodwink the plaintiff such that he or she was falsely enticed into inaction after her cause of action accrued"). Finally, fraudulent concealment must be pled with particularity under Federal Rule of Civil Procedure 9(b). *Speier-Roche*, 2014 WL 1745050, at *7 (internal citation omitted) ("Under Rule 9(b), the circumstances of the fraud must be alleged with specificity, i.e. the who, what, when, where, and how of the alleged fraud.").

In their amended complaint, Plaintiffs allege that Quincy "fraudulently concealed the truth from its customers." [ECF No. 15, p. 17]. Plaintiffs also allege the Quincy made "repeated false statements to consumers concerning the effectiveness of Prevagen." *Id.* Plaintiffs base this conclusion on allegations asserted in numbered paragraph 52:

> Instead of disclosing the ineffectiveness and inability of apoaequorin to cross the blood-brain barrier and affect the brain, Quincy falsely represented that Prevagen "[s]upports" "Healthy Brain Function," "Sharper Mind," and "Clearer Thinking." By making many affirmative misrepresentations that concealed the ineffectiveness of Prevagen as described in this complaint, Quincy actively and successfully concealed Plaintiffs' and class members' causes of action (which are based on the deceptive and untrue representations made by Quincy about Prevagen).

*Id.* at p. 17.

In other words, Plaintiffs' allegations go well "beyond mere non-disclosure." *Cf. Licul v. Volkswagen Grp. of America, Inc.*, No. 13-61686, 2013 WL 6328734, at *6 (S.D. Fla. Dec. 5, 2013) (rejecting fraudulent concealment theory as pled because Plaintiffs allege only that car manufacturer "has not publicized the defect to the public" and has not "warned its customers of the defect").

Whether fraudulent concealment is sufficient to toll the statute of limitations is a question of fact. *Razor Capital*, 2017 WL 3481761, at *5.

In the instant case, Plaintiffs have alleged affirmative and active misrepresentations, which are substantially different than simple non-disclosure.

**However**, Plaintiffs failed to allege (or even implicitly suggest) that they exercised reasonable care and diligence in seeking to learn facts which would have disclosed the

fraud. Similarly, neither their class certification motion nor their reply alleges the requisite care and diligence. Setting aside the procedural issue of whether Plaintiffs could effectively make the necessary allegation in a motion or memorandum (as opposed to making an actual allegation in the operative complaint), Plaintiffs' allegations about their fraudulent concealment theory lack an element. These allegations do not appear in the amended complaint, the class certification motion, the reply, nor supplemental memoranda. *See generally Fisher v. Harley-Davidson Motor Grp., LLC*, No. 2:19-CV-14154, 2019 WL 8014364, at *3 (S.D. Fla. Oct. 18, 2019) (finding plaintiff failed to show Defendant deliberately and actively concealed the material facts, to toll an FDUTPA claim despite plaintiff's allegations that "[defendant] made misrepresentations or omissions . . . in five different mediums: (1) user manuals, (2) advertisements, (3) customer service interactions, (4) communications to its dealer network and regulators, and (5) a confidential settlement in related litigation.").

Plaintiffs could conceivably seek leave to amend their complaint again to include this one additional allegation, but they have not done so yet, and I will not presume that one or both of the Plaintiffs did in fact exercise reasonable care and due diligence. Had Plaintiffs obtained leave of Court or consent from Quincy to file a second amended complaint and alleged in the next version of the complaint the missing element for a fraudulent concealment tolling doctrine, then I could have concluded that they adequately *alleged* the theory. But, as noted, this has not happened. Plaintiffs have not

tried to substitute a newer version of the complaint. They have, however, filed a class

certification motion which urges the Court to grant the motion now and schedule the first

part of a hybrid proceeding in 45 days.

The Undersigned finds that Plaintiffs have not adequately alleged a fraudulent

concealment exception to the four-year statute of limitations for their FDUTPA claims.[7]

Therefore, the Undersigned finds that the class should not include purchasers who made

purchases only before July 2015. Moreover, damages based on Plaintiffs' worthless

product/purchase price theory will not include damages for purchases before July 2015.

Given this recommended ruling, the Undersigned will not need to determine for

class certification evaluation whether Quincy's representations about memory

improvement in the first few years of Prevagen's 2007 product sales launch were

sufficiently similar to the "improve memory" representations which Quincy says

officially began in late 2012. Even if they were, they would, under the current pleadings

posture, be barred by FDUTPA's four-year statute of limitations. There is no dispute that

Quincy's representations about Prevagen as of July 2015 did include the "improve

---

[7]      If Plaintiffs had adequately alleged a fraudulent concealment theory to toll the
statute of limitations, then this affirmative defense (i.e., the statute of limitations) would
not bar class certification even if individual issues are certain to exist. *See In re Checking
Account Overdraft Litigation*, 307 F.R.D. 630, 651-52 (S.D. Fla. 2015); *see also Cox v. Porsche
Fin. Servs., Inc.*, 330 F.R.D. 322, 332 (S.D. Fla. 2019) (stating statute of limitations is an
affirmative defense "that may be raised later on, but does not typically preclude class
certification"). Here, I am not using the statute of limitations to *preclude* class certification;
I am assessing it to determine the scope of the class -- i.e., how far back may the purchases
be in order to be part of the class?

memory" representations (or, from Plaintiffs' perspective, the misrepresentations). Thus, any differences between the memory representations made after late 2012 and at times before July 2015 are irrelevant for purposes of deciding whether different representations were made to different putative plaintiffs. All putative plaintiffs who purchased Prevagen after late 2012 were involved with a consistent message and theme: the products improved memory.

The Undersigned acknowledges that Plaintiffs' motion for a show cause order does (or could) implicate the issue of whether Quincy made representations about Prevagen's so-called memory-improving qualities before late 2012, but that issue is not involved in the class action assessment, given that the statute of limitations prohibits claims for purchases made before July 2015. Thus, the Undersigned will issue a separate ruling on the motion for a show cause order.

## III.   ANALYSIS OF SPECIFIC CLASS ACTION FACTORS

### a.   Adequacy and Ascertainability of the Class Definition

Plaintiffs must meet the implicit Rule 23 requirement that the proposed class is "adequately defined and is ascertainable." *Reyes*, 2018 WL 3145807, at *9. "This is an implicit requirement under Rule 23." *Id.* Ascertainability is a "narrow inquiry" that is satisfied when "the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way." *Id.* at *9, *11. All Plaintiff must show is "an administratively feasible method by which class members can be

*identified*," *id.* at *9, "[n]othing more, nothing less," *id.* at *11.[8]

"The Eleventh Circuit has explained, in an unpublished opinion, that 'a class is not ascertainable unless the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way.'" *Id.* (citing *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015)).

Although a March 18, 2020 Westlaw citation report reveals that *Karhu* has been cited 73 times by Florida district courts since it was issued in June 2015, *Karhu* is an "unpublished" opinion. Federal Rule of Appellate Procedure 32.1 provides that courts may not prohibit or restrict its citation; and Eleventh Circuit Rule 36-2 provides that "unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  Similarly, Eleventh Circuit Internal Operating Procedure 7 to the Eleventh Circuit Rule provides that "the court generally does not cite to its 'unpublished'

---

[8]     In its Order granting in part the class certification motion, the *Racies* Court explained that the Ninth Circuit "recently rejected a similar argument that plaintiffs must identify an administratively feasible way to determine who is in the class in order to satisfy the requirements of Rule 23." 2017 WL 6418910, at *5. It cited *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017) ("[T]he language of Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification"). *Briseno* involved consumers who purchased certain cooking oil products allegedly packaged and sold with false and misleading language because the oils are made from bioengineered ingredients while the labels claim the products are "100% Natural." *Id.* But we are in a circuit where district courts usually follow the not-technically-binding opinion of *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) for its requirement that ascertainability must be established in order to certify a class. Therefore, *Racies*, while perhaps persuasive on other points, is of only modest help on ascertainability (which it did not analyze after noting that the factor is not a class certification requirement in the Ninth Circuit).

opinions because they are not binding precedent."

Currently, the circuits are split over whether a plaintiff must demonstrate at the class certification stage an "administratively feasible" method by which class members can be identified -- "the highest standard among the various circuits" -- and the Eleventh Circuit has not addressed this split in a published opinion. *Ocwen Loan Servicing, LLC v. Belcher*, No. 18-90011, 2018 WL 3198552, at *3 (11th Cir. June 29, 2018). The *Ocwen* Court did not even mention *Karhu* when it noted that "our sister circuits are split over whether this means a plaintiff must demonstrate an administratively feasible method for determining class membership over and above Rule 23's express requirements." *Id.* at *3 (internal citation omitted).

Despite this legal uncertainty over the status of the "administratively feasible" theory of the ascertainability requirement, courts in this district have (as noted above) found that plaintiffs meet the non-binding *Karhu* standard where they demonstrate that "class members can be identified at all, at least in any administratively feasible (or manageable) way." *Reyes*, 2018 WL 3145807, at *11 (citing *Miller v. Wells Fargo Bank, N.A.*, No. 1:16-CV-21145-UU, 2017 WL 698520, at *4 (S.D. Fla. Feb. 22, 2017)).

Class members can be identified using a combination of a defendant's records, third-party retailer data, and potential class members' affidavits, "so long as the records 'are in fact useful for identification purposes' and 'self-identification is administratively feasible and not otherwise problematic.'" *Reyes*, 2018 WL 3145807, at *11 (citing *Karhu*,

621 F. App'x at 946); *see also Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 526–27 (6th Cir. 2015) (emphasis added) (finding ascertainability requirement satisfied where (1) there was "evidence that a *single purchaser* [in proposed class] . . . could be identified using records of customer membership cards or records of online sales"; (2) defendant sold a significant amount of products to consumers online; and (3) "[s]tore receipts and affidavits can supplement these methods").

Applying these standards, the defined classes are ascertainable, for several reasons.

**First**, the class definitions are relatively precise (although not exactly as Plaintiffs requested) and class membership can be determined by objective means: if an individual purchased Prevagen in Florida during the Class Period (which covers purchases in the four-year statute of limitations), then the purchaser is a member of the class. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 650 (S.D. Fla. 2012); *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 691 (S.D. Fla. 2010) (certifying class of "[a]ll Florida consumers who purchased [product] within the applicable statute of limitations").

**Second,** Quincy possesses information useful for identifying some class members. As Quincy's CEO and President, Mark Underwood, attested to in verified answers to interrogatories in *Racies*, "[Quincy] maintains the information provided to [Quincy] by those customers who purchase directly from [Quincy], which information typically includes the direct customers' name, email address, and billing and/or street address."

*See Racies*, ECF Nos. 123-11, 12 (Sept. 15, 2017); [ECF No. 21-9].

Quincy contends that its own records can identify only "a fraction" of actual class members, which it says is insufficient. While this may be true, Quincy overlooks the point that its own records "represent a *starting point* from which [Plaintiffs] can further define the class . . . including the use of self-identifying affidavits and subpoenas." *Reyes*, 2018 WL 3145807, at *13 (emphasis in original). Quincy ignores that Plaintiffs proffer the same "combination of methods" approach this Court ruled in *Reyes* satisfies *Karhu*, which has been followed by other courts in this district. *See, e.g.*, *Eldridge v. Pet Supermarket, Inc.*, No. 18-22531-CIV, 2019 WL 4694142, at *7 (S.D. Fla. Aug. 21, 2019).

In addition, the plaintiff in *Karhu* "did not explain to the trial court that it envisioned a three-step identification process: (1) us[ing] the sales data to identify third-party retailers, (2) subpoena[ing] the retailers for *their* records, and (3) us[ing] those records to identify class members." *Karhu*, 621 F. App'x at 949 (emphasis in original). Moreover, as the Eleventh Circuit noted in *Karhu*, the plaintiff there "had not himself proposed an affidavit-based method" and therefore "necessarily had not established how the potential problems with such a method would be avoided." *Id.* Thus, "without a specific proposal as to how identification via affidavit would successfully operate, the district court had no basis to accept the method." *Id.*

Here, however, Plaintiffs *have* made myriad, specific proposals on the different identification methods they plan to use, and they rely upon an expert's declaration to

explain how potential issues would be resolved. In other words, Plaintiffs here took the steps which the *Karhu* plaintiff failed to take.

Had the plaintiff in *Karhu* taken the steps which the Plaintiffs took here, then he may well have satisfied the ascertainability requirement. *See generally Encarnacion v. Fin. Corp. of America*, No. 2:17-cv-566, 2018 WL 6250944, at *3 (M.D. Fla. Nov. 14, 2018) (distinguishing *Karhu*); *cf. In re Delta/Air Tran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 680 (N.D. Ga. 2016) (internal citation omitted) (discussing *Karhu* and ascertainability and explaining that "[o]f course, that identification of class members should not involve a great extent of individual inquiry does not suggest that *no* level of inquiry as to the identity of class members can ever be undertaken. If that were the case, no Rule 23(b)(3) class could ever be certified."); *see also Cox v. Porsche Fin. Servs., Inc.*, 330 F.R.D. 322, 330-32 (S.D. Fla. 2019) (distinguishing *Karhu* by noting its "insufficient explanation as to how exactly the data would aide class-member identification); *Owens v. Metro. Life Ins. Co.*, 323 F.R.D. 411, 416 (N.D. Ga. 2017) (finding ascertainability satisfied even though class membership determination would require examination of individual files).

Quincy's President Underwood also attested (in a declaration) in *Racies* that

> In 2015 and 2016 in California, for example, direct sales to individual consumers constituted only 18.1% and 5.4% of Quincy's California sales revenue, respectively. *The sales ratios in California are reflective of Quincy's sales in other states*. Before 2015, direct sales to individual consumers in California constituted about half of all sales in California.

*Racies*, ECF No. 128-1, 3 (Oct. 13, 2017); [ECF No. 21-10].

Further, Underwood also stated, in the same declaration, that "Quincy has a process for collecting consumer testimonials," through which they collect consumer's contact information for follow up. *Id.* This may provide contact information for Florida consumers who have *not* purchased Prevagen directly through Quincy. *Id*. According to Plaintiffs' expert in the field of legal notice, Cameron Azari, Esq.,[9] this is useful to ascertain class members, to provide notice and validate claims. [ECF No. 21-4, ¶¶ 14-15].

**Third**, Mr. Azari also opines that third-party retailers who sell Prevagen possess information sufficient to identify class members who purchased Prevagen and which can also be used to cross-reference and substantiate self-identifying affidavits to confirm class membership. *Id.* Plaintiffs have advised of their service of *duces tecum* subpoenas on several large retailers, requesting information about Prevagen purchasers. [ECF No. 21, p. 19, n. 9].

**Fourth**, self-identification of class members will be a manageable process because every bottle of Prevagen sold (from July 2015 and later) contained the same challenged ingredient (AQ) and was packaged with identical, uniform misrepresentations about

---

[9]       Mr. Azari's declaration explains that he is Director of Legal Notice for Hilsoft Notifications, a firm specializing in "designing, developing, analyzing and implementing large-scale, un-biased legal notification plans." [ECF No. 21-4, p. 2]. He further noted that Hilsoft has been appointed by courts to design and provide notice in many large and complex cases and that he has "provided testimony on numerous occasions on whether a certain method of notice represents the best notice practicable under the circumstances" -- including in Florida district court cases. *Id.* at p. 3. Plaintiffs emphasize that Quincy failed to take Mr. Azari's deposition, a scenario they describe as "shocking." [ECF No. 54, p. 6].

memory on the labels. *See, e.g., Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (finding class ascertainable and self-identification of class members manageable process where every bottle of [product] sold during the class period contained the allegedly misleading label, so potential class members were required to recall only whether they had purchased the product during the period); *see also* list of 44 cases -- 28 of which were contested -- where certification was granted although customer receipts may be unavailable. [ECF No. 21-11].

Some of those 28 cases mentioned immediately above involve class actions based on scenarios similar to the one at issue here involving Prevagen -- alleged misrepresentations about the purported health benefits of a product. *See, e.g., Johns v. Bayer Corp.*, 280 F.R.D. 551, 554 (S.D. Cal. 2012) (certifying class action based on allegations that phrase "support prostate health" on men's vitamins' packages was deceptive because there was no reliable scientific support for the promise); *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582 , 584 (C.D. Cal. 2011) (granting class certification motion in lawsuit against manufacturer of natural or homeopathic product which contained a representation on the outside of the package that the product relieves symptoms of the common cold); *see also Lee v. Carter-Reed Co., LLC*, 4 A.3d 561, 583 (N.J. 2010) (reversing and remanding lower court's denial of class certification for purchasers of a weight loss supplement which claimed the additional benefits of lessening anxiety and elevating mood -- claims which plaintiffs contended were lacking in any scientific support).

Class members will be able to self-identify through proof of purchase (such as receipts, credit card statements, or possession of the actual bottle(s) of Prevagen purchased) or through affidavit, and this can be cross-referenced with the other data collected and subjected to fraud-prevention checks. If that purchaser submits an affidavit claiming he purchased Prevagen from what Quincy's records show was an unauthorized retailer, then that purchase can be excluded.

Mr. Azari[10] opined that Rule 23 notice "can be effectively provided and an administratively feasible process for identifying and confirming Class membership implemented." [ECF No. 21-4, p. 11, ¶ 25].

**Fifth,** Plaintiffs have submitted a 12-point plan for satisfying the ascertainability requirement under the administratively feasible protocol discussed in *Karhu*, which, as discussed above, is not actually the law in this Circuit (and is merely persuasive). Plaintiffs submitted their 12-point approach to me at the hearing, and a copy is attached as Exhibit 1 to this Report and Recommendations. Several of the 12 points have already been discussed above, and the parties discussed many of the other points at the hearing.

The self-identifying affidavits, which troubled the *Karhu* Court and which Quincy criticizes, are only one of the 12 points discussed in Plaintiffs' ascertainability plan.

---

[10]     An exhibit to Mr. Azari's declaration notes that Hilsoft designed and implemented the claim deadline notice program for BP's $7.8 billion settlement claim deadline concerning the *Deepwater Horizon* oil spill. [ECF No. 21-4, p. 14].

Moreover, the plan discusses the significance of third-party retailer data for Prevagen, emphasizing that the majority of all Florida Prevagen sales are made through only four retailers in the relevant division: CVS, Walgreens, Publix, and Walmart. These retailers should have information which Plaintiffs can use to help identify class members.

In addition, Plaintiffs filed declarations from three third party retailers (The Vitamin Shoppe, Amazon, and Walmart) explaining their possession of information sufficient to identify and contact their own customers who purchased Prevagen, including the amount. [ECF Nos. 56-1; 66-7; 72-1].

For example, the Marketing Director for The Vitamin Shoppe explained that The Vitamin Shoppe has the ability to retrieve a customer's history if he identifies himself as a Vitamin Shoppe customer or member of its "Healthy Awards" reward program. [ECF No. 72-1, p. 3]. Likewise, the declaration from a Walmart employee explains that the company collects certain transaction data for online purchases, including the name, billing address, shipping address and email address of the customer. [ECF No. 66-7]. Similarly, an Amazon employee explained in her declaration that Amazon has the ability to run queries to identify customers who purchased certain products on a product-by-product basis. [ECF No. 56-1].

Based on the foregoing facts and expert opinion testimony, the Undersigned finds that the two Florida classes are ascertainable and class members can be identified through

an administratively feasible method.[11]

If Plaintiffs' proposals and analysis are incorrect and it turns out that the class is not ascertainable through an administratively feasible method, then Quincy could file a motion to *decertify* the class.

### b. Rule 23(a) Prerequisites

The Rule 23(a) prerequisites for class certification are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.

### i. Numerosity

"To establish numerosity, [a plaintiff] must show that the class is so numerous that joinder of all members is impracticable." *Manno v. Healthcare Revenue Recovery Grp., LLC,* 289 F.R.D. 674, 684 (S.D. Fla. 2013) (internal quotes and citation omitted); Fed. R. Civ. P. 23(a)(1). "While mere allegations of numerosity are insufficient, Rule 23(a)(1) imposes a generally low hurdle, and a plaintiff need not show the precise number of members in the class." *Manno*, 289 F.R.D. at 684; *see also Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (affirming certification of a class of "at least thirty-one individual class members"); *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) (internal citation omitted) ("A reasonable estimate is enough.").

While there is no exact number to establish numerosity, the Eleventh Circuit has

---

[11]    "The ascertainability element only requires that class members be identifiable *at some point* in the proceeding." *Eldridge*, 2019 WL 4694142, at *6 (emphasis added) (granting class certification motion and citing *Karhu*, 621 F. App'x at 952).

found that "generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (internal citation omitted). Accordingly, the numerosity requirement is a "generally low hurdle." *Vega*, 564 F.3d at 1267. Even so, a plaintiff still has the burden to make "*some* showing" that the class meets the numerosity requirement. *Id.*

During only a portion of the Class Period, Quincy sold thousands of bottles of Prevagen in Florida. [ECF No. 63]. Numerosity is therefore met. *See Cox*, 330 F.R.D. at 331 (finding numerosity was met where estimate of 42 members in one class and 112 class members in another class).[12]

### ii.  Commonality

Quincy has not challenged commonality in its opposition.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 349–50 (internal quotations omitted). The plaintiff must allege that the class injuries "depend upon a common contention" that is "capable of classwide resolution." *Id*. at 350.

Plaintiffs' claims raise common issues capable of classwide resolution. For

---

[12]     Quincy did not challenge the numerosity requirement in its opposition memorandum.

example, whether Quincy's AQ Memory Representations are true and whether Quincy's packaging and advertising of Prevagen is likely to deceive the public are common questions that can be analyzed and resolved on a classwide basis for all class members. *See Racies*, 2017 WL 6418910, at *4. Because this element is not in dispute, the Undersigned will not analyze it further.

### iii.   Typicality

To satisfy typicality, a class representative must possess the same interest and suffer the same injury as the class members. *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).

Rule 23(a)(3) typicality is satisfied where plaintiff's claims are "reasonably co-extensive" with absent class members' claims; they need not be "substantially identical." *In re Checking Account Overdraft Litig.*, 281 F.R.D. at 675. The test of typicality is whether "plaintiff's claim arises from the same event or practice or course of conduct that gives rise to the claim of the other class members, and if the claims are based on the same legal theory." *Aventura Chiropractic Ctr., Inc. v. Med Waste Mgmt. LLC*, No. 12-21695-CIV, 2013 WL 3463489, at *4 (S.D. Fla. July 3, 2013).

Moreover, a plaintiff's individual experience is irrelevant under FDUTPA because "[e]ach plaintiff is required to prove only that the deceptive practice would—in theory—deceive an objective reasonable consumer." *Nelson*, 270 F.R.D at 695; *see also Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279 (11th Cir. 2011) (explaining that a consumer's individual

reason for purchasing the product was immaterial).

Plaintiffs contend that their claims are typical because they arise from the same conduct: Quincy's "choice" to "prominently feature" the false and misleading AQ Memory Representations about memory improvement on every bottle of Prevagen. [ECF No. 21, p. 9]. And they say that the typicality requirement "does not require homogeneity." [ECF No. 66-1, p. 7].

But Quincy argues that the claims of the two named Plaintiffs are atypical for several reasons. [ECF No. 65-1]. It stresses the point that Collins' claim is for deceptive statements about mild memory problems associated with aging -- but he did not purchase Prevagen for *that* condition. Instead, he purchased Prevagen for his sister, who suffers from Alzheimer's disease, even though the disclosure on Prevagen's label advises that Prevagen is a dietary supplement and is not intended to treat or cure any disease.

And Quincy argues that Fowler's claims are also atypical of the putative class. Fowler has been diagnosed with memory loss, a neurological or degenerative disease, by a doctor who specializes in memory problems. That doctor offered Fowler the opportunity to be a study subject regarding memory loss and dementia and Fowler has accepted that offer.

Moreover, Quincy notes Fowler did not purchase Prevagen for mild memory problems associated with *aging*, but rather to cure or treat his subsequently-diagnosed memory loss. Fowler also purchased Prevagen *before* reading the challenged label. Fowler

also purchased multiple bottles of Prevagen from an unknown third-party on eBay, which Quincy contends is another circumstance undermining his assertion of typicality. *See Thorne v. Accounts Receivable Mgmt., Inc.*, 282 F.R.D. 684, 694-95 (S.D. Fla. 2012) (noting that commonality and typicality requirements of Rule 23(a) "tend to merge," further noting that those requirements "also tend to merge with the adequacy-of-representation requirement" and holding that named plaintiff's claims are not typical of the proposed class members' claims because she did not have a claim under one of the two statutes on which she based her claim).

In their reply, Plaintiffs argue that a consumer's individual reason for purchasing a deceptively marketed product is immaterial to the typicality analysis for FDUTPA class action claims. They say that Quincy ignores *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 695-96 (S.D. Fla. 1996) and *Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1280 (11th Cir. 2011), two FDUTPA class actions establishing that a consumer's individual reason for purchasing a deceptively marketed product is *immaterial* to the typicality analysis.

In *Nelson*, a consumer brought a class action against a baby formula manufacturer, alleging FDUTPA violations arising from alleged misrepresentations about the product. *Nelson*, 270 F.R.D. at 690. Defendant argued that the plaintiff was not a typical class member because the language at issue did not appear on the product until a year after she started buying the product. *Id.* at 695. The Court rejected this defense argument,

explaining that it "conflates the typicality requirement with Plaintiff's ability to **prove** a FDUTPA claim." *Id.* (emphasis added). After mentioning that the plaintiff would be a class member regardless of why she purchased the product if the purchase was made within the applicable statute of limitations, the Court held that the plaintiff could prove a FDUTPA claim without proving reliance on a particular representation. *Id.* at 696.

Thus, the *Nelson* Court held, the defense "argument that other members of the class viewed different representations than Plaintiff does not render Plaintiff's claim atypical of the class." *Id.* The Court also held that her claim was typical because she was exposed to certain messages about the product even if the product container did not contain the clinically proven message. *Id.*

*Fitzpatrick* involved an appellate decision of an order granting class certification in a FDUTPA action alleging false and misleading claims about the digestive health benefits of Yo-Plus yogurt. *Fitzpatrick*, 635 F.3d at 1280. The Eleventh Circuit agreed with the district court's analysis of the class action motion but vacated and remanded the class certification order because it was confused by the class as defined. *Id.* at 1281. That order, which correctly noted that a FDUTPA plaintiff need not show actual reliance on the representation or omission, then defined the class to all persons who purchased the yogurt in Florida "to obtain its claimed digestive health benefit" -- a definition which would "take into account individual reliance on the digestive health claims." *Id.* at 1283. On remand, the district court modified the class definition to be "all persons who

purchased Yo-Plus in the State of Florida until the date notice is first provided to the class" and kept all other aspects of its earlier order unchanged. *Fitzpatrick v. General Mills, Inc.*, U.S. District Court for the Southern District of Florida, Case No. 09-CV-60412, ECF No. 181.

Further, Plaintiffs argue that Quincy cites authority refuting its own arguments: *Singer v. AT&T Corp.*, 185 F.R.D. 681, 689 (S.D. Fla. 1998). The *Singer* Court *granted* class certification, finding that a plaintiff's claims are typical where they have "the same essential characteristics as the claims of the class at large." *Id*. at 689 (citing *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985)). In other words, "typicality turns solely on whether the plaintiff and the class have an interest in prevailing on similar claims. The typicality requirement does not demand homogeneity. Therefore, the existence of factual differences does not defeat typicality." *Id*.

Because the Plaintiffs here do not need to demonstrate reliance to pursue their FDUTPA claims, any differences in their reasons for purchasing Prevagen or in their consideration of the purportedly false statements about the product's benefits are insufficient to deem them atypical.

    iv.  <u>Adequacy</u>

The "'adequacy of representation' analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representative[] and the class; and (2) whether the representatives will adequately prosecute the action.'" *Valley*

*Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (internal citation omitted). "If **substantial** conflicts of interest are determined to exist among a class, class certification is inappropriate.'' *Id.* (emphasis added).

A party who is not familiar with the basic elements of his claims is not considered to be an adequate representative for the class because there is no sense that there is an actual party behind counsel's prosecution of the action. *Burkhalter Travel Agency v. MacFarms Intern., Inc.*, 141 F.R.D. 144, 153 (N.D. Cal. 1991). A plaintiff is an inadequate representative where he is so unfamiliar with the case that he will not serve the necessary role of "check[ing] the otherwise unfettered discretion of counsel in prosecuting the suit." *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (citations omitted); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (internal citation omitted) ("[C]lass representative status may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."). In considering the involvement and knowledge of a prospective class representative, "[t]he Court must feel certain that the class representative will discharge his fiduciary obligations by fairly and adequately protecting the interests of the class." *Koenig v. Benson,* 117 F.R.D. 330, 333-34 (E.D.N.Y. 1987).

The Undersigned finds that Plaintiffs and their counsel will fairly and adequately

protect and represent the interest of each class member.

No substantial conflict of interest exists between Plaintiffs and other class members. As they suffered the same alleged wrongs, Plaintiffs' claims are the same as all class members. Here, because Plaintiffs and class members all seek (1) a declaration that the AQ Memory Representations are false, making Prevagen worthless, and (2) full refunds for their purchases, Plaintiffs and "[a]ll of the members of the class are seeking recovery on the same grounds" such that Plaintiffs are adequate. *Singer*, 185 F.R.D. at 690.

Plaintiffs have diligently pursued this litigation on behalf of the classes and they retained a firm which has extensive class action experience related to deceptive trade practices.

The Undersigned is not persuaded by Quincy's argument that Plaintiffs lack knowledge of the case. A class representative is not required to become a legal expert or independently investigate his claims. "Merely relying on counsel to prosecute an action does not make a lead plaintiff inadequate." *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*, No. 17-cv-02207, 2019 WL 3449671, at *6 (N.D. Ga. July 17, 2019) (granting class certification motion in lawsuit against global provider of workforce payment product for false statements about its revenue growth while omitting that its growth was derived from fees and for a predatory fee scheme).

Further, Plaintiffs' deposition testimony demonstrates that they sufficiently understand the claims, conferred with counsel, and provided testimony.

As discussed in their respective depositions,[13] before Plaintiffs first purchased Prevagen, they were exposed to the AQ Memory Representations through television or radio advertisements and on the Prevagen package. [ECF Nos. 66-13, 9:11-10:16, 55:10-16, 93:20-94:14; 66-12, 8:3-6, 14:25-16:7, 24:16-17, 77:2-78:24.8]. Both still possess bottles of Prevagen they purchased. [ECF Nos. 66-13, 87:19-21; 66-12, 66:25-67:2]. Plaintiffs sued Quincy to expose the falsity of its AQ Memory Representations and to have the class receive refunds of the purchase price of Prevagen. [ECF Nos. 66-13, 47:17–18, 71:12–17, 75:1–7; 66-12, 95:15–18]. Plaintiffs have met and conferred with counsel and dedicated a substantial amount of time to this case, including responding to Quincy's written discovery requests and being deposed. [ECF Nos. 66-13, 42:13-43:15; 66-12, 64:19–65:5].

Plaintiffs are therefore more than adequate because they have "a very thorough understanding of the nature of this litigation and [their] role[s] as class representative[s]." *Brown v. Brewer*, No. CV 06-3731-GHK(JTLX), 2009 WL 1574556, at *4 (C.D. Cal. May 29, 2009) (finding that plaintiff was adequate "although Plaintiff could not remember some key elements of his case" and "referred to [a] nine[-]page memorandum" provided by counsel at deposition"); *see also Jimenez v. Menzies Aviation Inc.*, No. 15-cv-02392, 2016 WL

---

[13]     Fowler's deposition transcript excerpts are of record at ECF No. 66-13; Collins' deposition transcript excerpts are at ECF No. 66-12. Although they were filed under seal, Plaintiffs later advised the Court that these exhibits are no longer confidential and are no longer worthy of under-seal treatment.

3231106, at *6-7 (N.D. Cal. June 13, 2016).[14]

Plaintiffs have met the adequacy requirement.

### c.   Rule 23(b) Requirements

#### i.   Predominance

"Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Common issues unquestionably predominate this litigation. *See Racies*, 2017 WL 6418910, at *4 (finding predominance requirement satisfied because Prevagen is marketed only as a supplement that improves brain health and memory, everyone who purchased Prevagen would have been exposed to the AQ Memory Representations on its label, and plaintiffs could produce common evidence at trial that Quincy's AQ Memory Representations are false).

The FDUTPA claims require Plaintiffs to prove that Prevagen's advertising was

---

[14]    At the hearing, Plaintiffs' counsel represented that Collins purchased the product for his sister because "she had memory loss, that she did have Alzheimer's and she was losing her memory." [ECF No. 94, p. 60]. He conceded that Collins' sister "has Alzheimer's," but noted that he bought Prevagen for her because he "thought it would work" and "thought it would improve their memory." *Id.* at p. 61. Counsel also noted that (1) Alzheimer's "causes memory loss," (2) Mr. Collins wanted to help his sister, (3) Mr. Collins is "exactly the type of class member who they were targeting," (4) Quincy's marketing director testified that Quincy always "target[ed] memory loss," and (5) Quincy "want[ed] people to buy our product if they think they are suffering from memory loss." *Id.* at pp. 128-29.

Plaintiffs' counsel also explained that "it's a question for the jury to decide is this [i.e., Mr. Collins' testimony about why he bought Prevagen for his sister] just a false representation . . ." *Id.* at p. 61.

false or misleading, which, as *Racies* discussed in connection with two California statutes prohibiting unfair or deceptive acts, is an objective standard, "asking whether the representations would be material to a reasonable consumer." *Racies*, 2017 WL 6418910, at *3. The Court held that Plaintiff may present commonly-applicable evidence, including his expert's opinion "that basic scientific principles show that Prevagen cannot provide the benefits claimed, to establish the falsity of Defendant's efficacy representations." *Id.* at *4.

### d.  Common Issues Can Be Proven on a Classwide Basis

For the liability issue, the overriding common questions are whether Quincy's AQ Memory Representations are false and whether those misrepresentations were likely to deceive a reasonable targeted consumer. *See, e.g., Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983-84 (11th Cir. 2016) (citation omitted).

The first question is to determine whether Quincy's AQ Memory Representations about Prevagen are false or not. If each class member were to pursue his or her claim individually, then the evidence, including the science, necessary to support the individual claims would be identical in each case. *See Racies*, 2017 WL 6418910, at *4 ("Accordingly, at trial, Plaintiff may present commonly-applicable evidence, including his expert's opinion that basic scientific principles show that Prevagen cannot provide the benefits claimed, to establish the falsity of Defendant's efficacy representations. This further supports a finding of predominance.").

The second predominant question, the likelihood of deceiving a reasonable consumer in the targeted market, is an objective inquiry. *See Carriuolo*, 823 F.3d at 983-84 (citation omitted).

Given these circumstances, there is a sufficient basis to find that the requirements of Rule 23(b)(3) have been met. *See Checking Account Overdraft Litig.*, 275 F.R.D. at 676 (finding predominance satisfied where plaintiffs alleged the class was adversely affected by the defendants' common course of misconduct and submitted evidence supporting that allegation); *see also Fitzpatrick*, 263 F.R.D. at 700-01 (finding predominance satisfied when alleged misrepresentation of product's health benefits was displayed on every package).

### e. Predominance Not Defeated by Reliance and Causation Arguments

There are no individualized issues of reliance or causation under FDUTPA. *Carriuolo*, 823 F.3d at 984; *see also Davis v. Powertel*, 776 So. 2d 971, 975 (Fla. 1st DCA 2000) (addressing a classwide FDUTPA claim and holding that "[b]ecause proof of reliance is unnecessary, the plaintiff's inability to show reliance in every case cannot be used to justify a finding that individual issues will predominate over the class claims"); *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009) ("[T]he FDUTPA does not require plaintiff to prove actual reliance on the alleged conduct."); *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007) ("A deceptive practice is one that is likely to mislead consumers," actual reliance is not

required.); *Gold Coast Racing v. The Home Depot U.S.A., Inc.*, No. 05-61931-CIV, 2006 WL 4579688, at *2 (S.D. Fla. Feb. 6, 2006) (finding actual reliance on the representation or omission at issue need not be shown).

Plaintiffs have sufficiently established the predominance factor and Quincy's reliance emphasis is not a well-placed theory.

### f.   Relief Can Be Provided on a Classwide Basis

Classwide methods of proof directly tied to Plaintiffs' theories of liability are available and can be used at trial to establish the amount that should be paid to the class as restitution or in damages. *Cf. Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433-35 (2013). Plaintiffs contend that classwide evidence will show that they and class members purchased worthless products that do not provide any of Quincy's AQ Memory Representations, Prevagen's only represented benefit.

The *Racies* Court accepted this view when it entered an Order granting in part the class certification motion for California Prevagen purchasers. *Racies*, 2017 WL 6418910, at *3. Thus, Prevagen's purchase price provides a common classwide method of measuring the economic loss attributable to Quincy's FDUPTA violations. *See Rollins, Inc. v. Butland*, 951 So. 2d 862, 869 (Fla. 2d DCA 2006) (citations omitted) (holding that "when the product is rendered valueless as a result of the defect—then the purchase price is the appropriate measure of actual damages"); *see also Racies*, 2017 WL 6418910, at *4 ("Plaintiff may present commonly-applicable evidence, including his expert's opinion that basic

scientific principles show that Prevagen cannot provide the benefits claimed.").

The full-refund damages model is also appropriate because consumers have no reason to purchase Prevagen except for its misrepresented benefit. *See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 523-24 (6th Cir. 2015) (internal citation omitted) ("A full refund for each class member [(who purchased a probiotic nutritional supplement which supposedly did not work as advertised)] is appropriate because, as the district court explained, there is no reason to buy Align except for its purported digestive benefits—[i]t is a capsule filled with bacteria and inert ingredients. If, as alleged, that bacteria does nothing, then the capsule is worthless.").

Whether consumers were otherwise satisfied with Prevagen does not affect this damages model because if Prevagen cannot affect the brain as a matter of body chemistry, then any purported benefit would be the result of the placebo effect. *Id*. at 524 (citing *Forcellati v. Hyland's, Inc.*, No. 12-CV-1983, 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014) (quotations omitted) (holding that restitution is the appropriate damages model even for satisfied customers if the plaintiffs prove that "Defendants' products are placebos, and that the products' effectiveness arises solely as a result of the placebo effect")).[15]

---

[15]     The *Rikos* Court affirmed an order certifying the class. *Rikos*, 799 F.3d at 502. In doing so, it addressed the defense argument that it introduced evidence that some class members benefitted from the product (called "Align") or that scientific evidence could establish that Align works for some users. *Id.* at 523. In rejecting that argument, the appellate court noted that Plaintiffs were claiming that Align works for *no one*. *Id.* Therefore, the Court held, if Align "in fact is proven scientifically to work for **some** individuals, Plaintiffs will **lose on the merits**." *Id.* (emphasis added). And it held that

As noted earlier, however, Quincy emphasizes that different purchasers pay different prices for Prevagen, depending on where and how they obtain the supplement. But the possibility that each class member may have suffered different amounts of damages (based on the amount spent to purchase the product) does not alter this analysis. *See Brown*, 817 F.3d at 1239 (internal citation omitted) ("The 'black letter rule' recognized in every circuit is that individual damage calculations generally do not defeat a finding that common issues predominate.").

In its opposition, Quincy contends that Plaintiffs' "full refund proposal would require a series of mini-trials." [ECF No. 40, p. 9]. But "the Eleventh Circuit has made clear that **individual issues** relating to damages **do not defeat class certification**." *Cox*, 330 F.R.D. at 335 (emphasis added) (citing *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003));[16] *see also Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183-84 (9th Cir. 2017), *rev'd on other grounds*, 139 S. Ct. 710 (2019) (finding that "full refund" model of measuring damages was consistent with theory of liability "that the product has no or only a de minimis value," and further finding that multiplying "suggested retail price" by number of "unit sales" sold over the relevant time period constituted a workable

---

Plaintiffs' damages model -- a full refund of the purchase price -- satisfies *Comcast's* "rigorous analysis." *Id.*

[16]     The *Allapattah* Court also held that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." 333 F.3d at 1261.

damages methodology at the class certification stage); *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 814 (9th Cir. 2019) (reversing and remanding district court order denying class certification motion for what it viewed as an inappropriate measure of damages and holding that Plaintiff's proposed benefit-of-the-bargain damages model is consistent with *Comcast* because the model is consistent with his theory of liability).

Although Quincy claims that Plaintiffs' methodology is unsupported by authority from this Court, it cites case law supporting the full refund theory. *See Seidman v. Snack Factory, LLC*, No. 14-62547, 2015 WL 1411878, at *3-4 (S.D. Fla. Mar. 26, 2015) (collecting cases); *see also Bohlke v. Shearer's Foods, LLC*, No. 9:14-CV-80727, 2015 WL 249418, at *8 (S.D. Fla. Jan. 20, 2015) (allowing full refund theory under FDUTPA in case alleging that "all natural" and "no artificial ingredients" packaging was false and misleading).

Quincy further contends that its money-back guarantee approach is a superior alternative to a class action, but the *Racies* Court was not persuaded by this argument. *Racies*, 2017 WL 6418910, at *5 ("A refund is also not a superior alternative to *adjudicating* class members' claims.") (citing *Korolshteyn v. Costco Wholesale Corp.*, No. 3:15-CV-709-CAB-RBB, 2017 WL 1020391, at *8 (S.D. Cal. Mar. 16, 2017) ("[A]llowing class members to obtain a refund is not an alternative to 'adjudicating.' If it were, then Costco (and any retail store) could freely misrepresent the benefits of their products secure in the knowledge that their return policy effectively immunizes them from any suit seeking restitution.")).

As Plaintiffs explained in their motion, class members can be identified and their damages can be calculated on a classwide basis using pricing and sales data maintained by Quincy, through self-identification of class members and their purchases, as well as retail sales data that can be obtained from third parties, such as Costco and Walmart. Thus, classwide damages attributable to the classwide misrepresentations can be readily determined.

And if it turns out that Quincy is actually correct and the damages cannot be reasonably calculated, then Quincy is "sufficiently protected" because "a Rule 23 decertification motion may be brought at any time." *Zyda v. Four Seasons Hotels and Resorts Four Seasons Holdings Inc.*, No. 16-00591, 2018 WL 1528159, at *3, *13 (D. Haw. Mar. 28, 2018) (denying motion to decertify class, noting that it "need not determine damages apportionment" at the current state of litigation and holding that refund model is "workable method, and is sufficient for purposes of the predominance inquiry").

### g. Superiority

Rule 23(b)(3) superiority requires the court to analyze "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *See Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 521 (S.D. Fla. 2013) (granting class certification motion in lawsuit filed by a bank customer whose account had been assessed a fee by a check recovery service after a check she wrote was returned for insufficient funds). In this case, where "class members' claims are predicated on a

common set of facts and concern the same allegedly deceptive practice," a class action is more desirable as a vehicle for adjudicating the plaintiffs' claims. *Nelson*, 270 F.R.D. at 698 (finding superiority requirement met and explaining that the predominance analysis has a "tremendous impact" on the superiority analysis because class actions are more desirable when common issues predominate over individual issues).

Because Quincy's purported liability to all class members is based on whether the AQ Memory Representations are false or misleading, judicial efficiency weighs in favor of a class action. *See Carriuolo*, 823 F.3d at 989 (disagreeing with defendant car manufacturer's argument that a class action is not superior).

On the other hand, it is not economically feasible for thousands of class members to pursue their claims against Quincy individually, given that the amount in controversy pales in comparison to the enormous expense associated with litigating the question of whether Quincy's claims are false. *See id*. (noting that there are 1,058 potential class vehicles in Florida and agreeing with district court's assessment that "individual claims may be too small for a separate action by each class member"); *see also Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 675 (S.D. Fla. 2012) (noting that the "economic reality is that many of the class members would never be able to prosecute their claims through individual lawsuits").

Plaintiffs have met the superiority requirement.

## IV.    A WORD ABOUT TIMING

Quincy's motion to dismiss is still pending, which means it has not yet filed an answer to the first amended complaint. Given this scenario, a ruling on the class certification motion would not violate the rule against one-way intervention.[17]

## V.    DECLARATORY RELIEF

Plaintiffs seek hybrid certification of the class under Rule (b)(2) *in addition to* Rule (b)(3). *See, e.g., Cox*, 330 F.R.D. at 336 (granting hybrid certification under Rules 23(b)(2) and (b)(3) where plaintiffs sought monetary and equitable relief). Plaintiffs' requested declaratory relief would apply to Plaintiffs and all class members, who were all exposed to the AQ Memory Representations. *See id.* Therefore, the proposed class is amenable for certification under Rule 23(b)(2).[18]

---

[17]     "'One-way intervention' occurs when the potential members of a class action are allowed to 'await . . . final judgment on the merits in order to determine whether participation [in the class] would be favorable to their interests.'" *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1252 (11th Cir. 2003) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974)). "The result is that putative class members can simply observe the proceedings without assuming any risk that their individual claims may be precluded by an adverse ruling on the merits." *Newton v. S. Wood Piedmont Co.*, 163 F.R.D. 625, 630 (S.D. Ga. 1995), *aff'd*, 95 F.3d 59 (11th Cir. 1996). That is a potential problem, because without class certification, the absent plaintiffs would not be bound by the court's ruling on the merits. "Rule 23(c)(2)'s requirement that, in opt-out class actions, notice be given to all class members as soon as practicable was intended by Congress to prevent one-way intervention." *London*, 340 F.3d at 1252-53 (citing *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995) ("[D]istrict courts generally do not grant summary judgment on the merits of a class action until the class has been properly certified and notified.")).

[18]     That subsection of Rule 23 permits a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

## VI.     CONCLUSION

The Undersigned **respectfully recommends** that the District Court (1) **grant** Plaintiff's motion for class certification by certifying a Florida-only FDUTPA class for purchases of Prevagen made within the four-year statute of limitations (i.e., by July 11, 2015) and for declaratory relief; (2) bifurcate the proceedings into liability and damages phases; (3) appoint Plaintiffs as class representatives; and (4) appoint The Moscowitz Law Firm, PLLC and Searcy Denney Scarola Barnhart & Shipley PA as class counsel.

The Undersigned deems it prudent to **not** make a specific recommendation on Plaintiffs' request for an expedited trial to determine whether Quincy's AQ Memory Representations are false -- because the timing and scheduling of trials is up to United States District Judge Marcia G. Cooke.  The Undersigned does not consider it appropriate for me to recommend to Judge Cooke how to handle her trial calendar.

## VII.    OBJECTIONS

The parties will have fourteen (14) days from the date of this Report and Recommendations within which to file written objections, if any, with United States District Judge Marcia G. Cooke. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in

---

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

the Report and shall bar the parties from attacking on appeal unobjected-to factual and

legal conclusions contained in this Report except upon grounds of plain error if necessary

in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985);

*Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on March

19, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Marcia G. Cooke
All Counsel of Record

76