# PLAINTIFFS' 12 POINT ASCERTAINABILITY PLAN

1. Plaintiffs compiled wealth of record evidence (starting with tens of thousands of documents/materials from *Racies* located on internet plus additional discovery produced in this case) demonstrating that the Florida Class is ascertainable through cross-referencing: (1) Quincy's own direct data; (2) third party retailer data (already subpoena to many); and (3) consumer data and affidavits.

2. Plaintiffs submitted ***Expert Declaration of Cameron Azari***, nationally renowned expert in field of legal notice and locating class members. Quincy surprisingly declined to depose him. ECF No. 21-4. Mr. Azari attests that all of the following information and records can be cross-referenced to identify all Florida class members in manageable plan giving due process to Quincy under all applicable laws. Id., ¶¶ 12–16. Quincy decided not to depose Mr. Azari **(like Reyes)** and/or provide any contrary expert/legal authority.

## QUINCY'S DATA and OTHERS INFORMATION OBTAINED HERE

3. **DIRECT SALES OF PREVAGEN**:

   Quincy maintains consumer information (including specific name, address and date of purchase) for all of its direct online sales. See ECF No. 21-9, ("[Quincy] maintains the information provided to [Quincy] by those customers who purchase directly from [Quincy], which information typically includes the direct customers' name, email address, and billing and/or street address.")). Quincy sold 230,888 bottles or $7,463,065.00 direct to consumers, making up over 15% of Quincy's Florida revenue since 2011. Thomson Exs. 5–6, 8. This information would be used to provide notice and validate claims. Plaintiffs even obtained "Suggested Retail Price Information", not obtained in *Racies* (which moved to compel). Plaintiff also deposed Quincy CFO and Marketing Director (unlike other cases).

4. **QUINCY'S OWN CONSUMER DATABASE**:

Quincy Maintains (unlike most other companies) a database with contact information for thousands of consumers who subscribed to receive weekly emails from Quincy. Olson 17:1–18:23. Prevagen packages include an insert with a form allowing consumers to submit their contact information to Quincy to obtain promotional materials from Quincy. Olson 19:16–20:10.

5. **PREVAGEN CUSTOMER TESTIMONIAL INFORMATION**:

Quincy has website with a form it uses to collect consumer contact information for their "testimonials" about their use of Prevagen, all of which is compiled in a "master testimonial record" that contains information identifying the class members (name, email, etc.). Olson 63:17–65:16.

6. **MANY PREVAGEN SALES/CUSTOMER PURCHASE CHARTS:**

Quincy was forced to produce charts showing it tracks every single bottle and to every single retailer that it sells *any* Prevagen to (including the number of bottles and dollar amount). Thomsen 39:10–20; 40:2–23; 42:3–10; 43:10–16; 44:1–9; 46:3–9; Reply at Exhibit G; Thomson Ex. 7 (Division 20, or "mom-and-pop-type retailers"); Thomson Exs. 3–4 (Division 30, "mass retailers"); Thomson Exs. 5–6 (Division 40, or "direct-to-consumer"). Quincy tracks exact amount of refunds it issued for Prevagen across all four sales divisions. See Reply at Exhibit H.

7. **QUINCY PRODCUED 100% PREVAGEN SALES TO FLORIDA**:

Totaling sales of Quincy's Divisions 10–40 yields 100% of Quincy's revenues from Florida sales of Prevagen. Thomsen 48:16–49:1; 50:2–51:6; Thomson Ex. 9 (total Florida Prevagen revenue from 2011–Q2 2017); Reply Exhibit I (total Florida Prevagen revenue from Q3 2017–Oct. 2019).

8. **THIRD-PARTY RETAILER DATA FOR PREVAGEN:**

Majority of all Florida sales of Prevagen made through just four largest retailers in Division 30 (the "Large Retailers"): CVS and Walgreens (since 2012), Publix (since 2016), and Walmart (since 2019). Sales from the Large Retailers have totaled 870,172 bottles (or $25,339,294.00 wholesale in Florida), making up about 99.2% of Quincy's revenue from Division 30 sales in the State of Florida, or two thirds of Quincy's total Florida sales since 2011. Olson 33:5–34:15; Thomsen Ex. 3; Thomson Ex. 9; Reply Ex. I.

9. **SWORN DECLARATIONS FROM THIRD PARTY RETAILERS:**

**The Vitamin Shoppe [ECF No. 56, 72]**
**Amazon [ECF No. 56]**
**Walmart [ECF No. 54-6]).**

(Karhu said serving retailer subpoenas may be sufficient, but Karhu just never did it in that case, we have 3 of the largest)

Each explain in detail they have information sufficient to identify and contact their own customers who purchased Prevagen, including the amount. Include the majority of Prevagen customers.

10. **SUBPOENAS FROM OTHER LARGE RETAILERS:**

Plaintiffs will issue subpoenas to list of remaining largest retailers in Florida that sold the Prevagen product. This information would be combined with the other available data and used to provide notice and validate claims.

## 11. CONSUMERS CAN USE SELF-IDENTIFYING AFFIDAVITS:

Florida consumers will validate claims with purchase receipts, order confirmation, credit card statements, or even producing actual Prevagen bottle(s) purchased (both Plaintiffs in this action retained at least one bottle of the Prevagen they purchased). ECF No. 21-4, ¶ 15. Absent proof of purchase, consumers will submit affidavits indicating, among other things, they purchased Prevagen within the class period, the retailer they purchased from, the location of purchase, about when the product was purchased, the amount paid, and the payment method used. ECF No. 21-4, ¶ 15.

## 12. PROTECTING QUINCY DUE PROCESS PROTECTIONS:

a. Mr. Azari testified that (to address the issues of administrative infeasibility and protecting defendant's procedural due process, fraud-prevention screening factors such as the verification of prices paid, geographic retail locations, cross-referencing information provided in the affidavit with the subpoenaed third-party retailer information, or some combinations thereof, are effective methods routinely employed by claims administrators to weed out the vast majority of fraudulent claims. Additional fraud prevention measures include sophisticated and state-of-the-art data matching and loading technologies that identify patterns of duplication and fraudulent behavior based on the conditions of a particular class administration. Moreover, claims administrators work with local and federal authorities in the detection, identification, tracking and reporting of known and new fraudulent filers. Though measures like these are routinely used to screen for potentially fraudulent claims, Azari has found based on his extensive experience that the vast majority of claims filed in consumer class actions are legitimate, even in cases where receipts are unavailable. Instances of fraudulent claims are rare and readily screened using standard fraud-prevention techniques. ECF No. 21-4, ¶ 15.

b.  Mr. Azari also testified that an efficient, supplemental media effort can be created, geographically targeting areas in Florida where Prevagen was sold. The media would direct people to an informational website where they could self-identify as Class members and learn the kinds of supporting information they may need to gather to establish Class membership and eligibility to participate. ECF No. 21-4, ¶ 15. Quincy spends 45-50% of budget on advertising.