# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

### CASE NO. 19-22864-CIV-COOKE/GOODMAN

JUAN COLLINS, et al.,

    Plaintiffs,

v.

QUINCY BIOSCIENCE, LLC,

    Defendant.

_____/

### ORDER ON PLAINTIFFS' MOTION FOR A SHOW CAUSE ORDER
### RE: SANCTIONS AGAINST DEFENDANT AND ITS COUNSEL

In this putative class action lawsuit against the manufacturer of a purported memory-improving supplement, Prevagen, Plaintiffs have filed a 20-page motion for a show cause order against Defendant Quincy Bioscience, LLC and its counsel. [ECF No. 95]. Plaintiffs allege that Quincy and its counsel have been "coordinating an ongoing pattern of misrepresenting crucial facts" to the Court in order to "delay these proceedings" until they can use the "MDL process to transfer this case away" to another Court. *Id.* at p. 1.

Plaintiffs accuse Quincy and its counsel of using "nefarious" tactics, and they ask that the Court require Quincy's counsel and its "company representatives," including its marketing development director (Todd Olson, who submitted a declaration in this case),

to appear in person for a show cause hearing "so that the Court can understand who is ultimately responsible for deciding to present these specific misrepresentations to the Court." *Id.* at p. 3. They also want this Court to determine whether Quincy's officers and attorneys acted in bad faith or violated the Rules of Professional Conduct and to "fashion appropriate sanctions for such bad faith conduct." *Id.* at p. 20.

Not surprisingly, Quincy objects and uses equally inflammatory rhetoric to condemn Plaintiffs' motion. [ECF No. 98]. Branding the motion as "baseless," Quincy's 20-page opposition response contends that Plaintiff's motion itself "raises serious concerns under Rule 11." *Id.* at p. 16. Quincy's response demands that Plaintiffs' counsel "should be held accountable for their reckless and unethical behavior" and concludes by describing the motion as "egregious, misleading, and is supported by no evidentiary basis." *Id.* at pp. 16, 20.

Not content to give Quincy the last word in the strident language war, Plaintiffs filed a 10-page reply in which they argue that Quincy's opposition response failed to controvert the facts demonstrating that Quincy "has acted in systematic bad faith and willfully misled this Court." [ECF No. 102, p. 10].

So, counsel seem to have given their thesauruses vigorous workouts, hunting for powerful adjectives and provocative phrases in which to criticize their opponents and fire metaphorical missiles.

For the reasons described below, however, the Undersigned **denies** the motion

**without prejudice**.

I.      **Factual and Procedural Background**

At bottom, Plaintiffs allege that Quincy's representations about Prevagen's so-called memory-enhancement benefit are absolutely false and cannot possibly be true as a matter of body chemistry. Plaintiffs contend that Prevagen's primary ingredient, the protein apoaequorin ("AQ"), is "merely a protein that, once digested, is completely and rapidly digested and transformed into common amino acids (and possibly small peptides) no different than those derived from other dietary proteins and cannot cross the blood brain barrier to reach the brain or affect its functioning." [ECF No. 21, p. 2]. Similarly, they say that a single dose of Prevagen accounts for only approximately 0.013-0.053% of the protein the average person consumes daily, which means the protein consumed daily from Prevagen "amounts to a mere drop in the ocean that can have no measurable effect on the brain." [ECF No. 1, p. 2].

Plaintiffs' amended complaint [ECF No. 15], which is subject to a fully-briefed and still-pending motion to dismiss [ECF No. 25], advances three counts: Counts I and II for violations of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), and Count III for unjust enrichment. The Undersigned recently issued a Report and Recommendations recommending that United States District Judge Marcia G. Cooke certify a Florida class for Prevagen purchases made before July 11, 2015 (i.e., consistent with the four-year statute of limitations for claims based on FDUTPA).

Plaintiffs' motion for a show cause order concerns arguments and representations which Quincy and its counsel made in connection with the class certification motion. Plaintiffs' motion focuses on three categories of representations relating to the class certification motion: (1) those relating to a so-called "Global Settlement" between Quincy and a proposed nationwide class, a resolution apparently negotiated by different plaintiffs' attorneys in other similar lawsuits against Quincy; (2) those concerning the marketing of Prevagen and how those efforts varied over time; and (3) those which discuss scenarios where Quincy mentioned Alzheimer's disease or suggested (either directly or implicitly) that Prevagen could benefit Alzheimer's patients.

The first category of alleged misrepresentations can further be divided into two categories: those which Quincy made in its motion to stay [ECF No. 48] and those made by its counsel at an in-person, multi-hour discovery hearing [ECF No. 49]. Plaintiffs contend that Quincy misrepresented the facts when it advised this Court, in its stay motion, that a "Global Settlement has been reached on a nationwide class that includes Plaintiffs Juan Collins and John Fowler . . . as well as each member of the putative class of consumers they seek to represent in this Action." [ECF No. 48, p. 2].

Plaintiffs further focus on the discovery hearing, when a Quincy attorney advised the Undersigned, in response to a question I posed at the hearing, that he "think[s] it [the so-called "Global Settlement"] stands a **good chance** of being approved." [ECF No. 51, p. 37 (emphasis added)].

At bottom, Plaintiffs argue that these representations are actually **mis**representations because the proposed settlement involves injunctive relief which must be approved by the Federal Trade Commission and the New York Attorney General, who are involved in similar litigation with Quincy over the sale and marketing of Prevagen -- but who apparently had not agreed to the specifics of injunctive relief.

Approximately two weeks after Quincy's counsel made the representations at the November 22, 2019 discovery hearing, an FTC attorney wrote a letter to a different Court, which is presiding over the FTC lawsuit. In this December 4, 2019 letter, the FTC attorney advised that the FTC was "**concerned** to learn . . . that Quincy's counsel has represented . . . that Quincy was close to reaching some agreement with the FTC and the NYAG and that 'agreed-to injunctive relief would be announced shortly.' **At no time** before or since the filing of the [FTC Action] have the parties been **close to agreeing on injunctive relief**." [ECF No. 54-2, p. 3 (emphasis added)]. After Plaintiffs flagged the FTC attorney's letter to Quincy, Quincy withdrew its motion to stay.

Quincy denies that it or its counsel made any misstatements about the Global Settlement. It notes that the Stipulation of Settlement was jointly submitted (by Quincy and the three plaintiffs in the Southern District of New York) to a federal district judge in the Southern District of New York. Quincy notes that the Stipulation of Settlement was **signed** by three different law firms representing different plaintiffs and reflects a settlement on behalf of a nationwide class which includes the two Plaintiffs in the instant

case.

Quincy also emphasizes that the Settlement Stipulation has a "walkaway provision" permitting any party to it to withdraw if Quincy could not agree to injunctive relief with the FTC and the NYAG. [ECF No. 98, p. 5]. Although Quincy did not expressly make the point in its opposition response, one conclusion to be drawn is that the mere existence of a walkaway provision in a signed Settlement Stipulation does not mean that there is not a settlement; it simply means that the Settlement Stipulation, if approved by the district judge in the Southern District of New York, could result in one or more parties withdrawing from an existing and approved settlement. Thus, Quincy argues, there is a Global Settlement and its representations about the settlement's existence are correct.

Concerning the comments made by Quincy's counsel at the hearing, Quincy does not (and cannot) deny that he advised the Court that the class action settlement "stands a good chance of being approved." [ECF No. 54-1, p. 35: 10-11]. Nevertheless, Quincy highlights several other comments made at the hearing which it believes are necessary to place counsel's prediction in context.

First, Quincy says that the prediction was "in response to an unfounded theory proposed by Plaintiffs' counsel that the Stipulation was made up by 'two friends who got together and created an agreement.'" [ECF No. 98, p. 6]. Second, Quincy emphasizes that it further clarified that the Settlement Stipulation and any potential injunctive relief "would have to be agreeable to the FTC" and that he thought the "class settlement can

walk away" if the FTC is not agreeable. *Id.* Third, Quincy pointed out to the Court that the FTC is not a party to the Settlement Stipulation. Fourth, Quincy noted that its counsel advised the Undersigned that he was "not the one negotiating with the FTC. So unfortunately, [I] cannot report on that." *Id.* Fifth, Quincy reminded this Court that I mentioned my assumption that the district judge in the Southern District of New York stayed the class actions because "she anticipated that there was, in fact, going to be a settlement." [ECF No. 54-1, p. 20:12-16]. Sixth, Quincy pointed out that it promptly withdrew its motion to stay "[a]s soon as agreement with FTC regarding injunctive relief appeared unlikely." [ECF No. 98, p. 6].

Finally, Quincy contends that its counsel "has never represented to anyone that it was close to any type of agreement with [the] FTC and has only relayed the accurate fact that it had attended meetings simultaneously with [FTC officials and their litigation counsel] to discuss a potential resolution." *Id.* Quincy argues that this fact-relaying scenario is "unquestionably true." *Id.* at p. 7.

In their reply, however, Plaintiffs say that "Quincy clearly conveyed to the Court that it was a done deal when, in fact, it was wholly contingent on a non-existent agreement with the FTC and NYAG to change the marketing of Prevagen." [ECF No. 102, p. 4]. They emphasized that *Quincy* -- and not the plaintiffs in the SDNY actions --is the party negotiating with the FTC over injunctive changes to its marketing. Thus, Plaintiffs argue, it was "certainly deceptive and misleading for Quincy to omit the truth about the

7

failed status of those negotiations when it told this Court that the Global Settlement would likely be approved." *Id.*

Therefore, Plaintiffs conclude, "Quincy's statements that the 'Global Settlement *has been reached*' and that it had a 'good chance of being approved' were false because without an agreement between Quincy and the FTC/NYAG, there was simply never going to be a deal for any court to approve.'" *Id.* at p. 5.

The second category of alleged misrepresentations by Quincy concerns its statements about how its marketing has evolved over time. Quincy advanced this point to bolster its position that the two named Plaintiffs would not have been exposed to the same marketing representations made to consumers or proposed consumers in 2007[1] (when the product was launched) through late 2012, when the labeling for the first time expressly mentioned a purported memory-improvement benefit. The Undersigned directed Quincy to search its records for representations about memory, even if those statements were not on the label. In response, Quincy submitted a supplemental declaration which disclosed that other marketing and advertising did in fact mention memory and improving memory before late 2012.

---

[1] The Undersigned asked Quincy to search its records back to 2007 because Plaintiffs' class certification motion sought to certify a class of consumers dating back to Prevagen's launch in 2007. The Undersigned recently issued a Report and Recommendations which cuts off the class at July 2015, consistent with the applicable four-year statute of limitations for FDUTPA claims. But the deadline for filing objections to that R & R has not yet expired.

Therefore, Plaintiffs argue, although Quincy claimed that its marketing changed over time,[2] "there is simply no good faith basis for Quincy or its counsel to deny that the overarching message of Quincy's advertising of Prevagen is, and always has been, that Prevagen can improve your memory." [ECF No. 95, p. 11].

Quincy's opposition response argues that Plaintiffs' first amended complaint focused on Prevagen's *labels* and that its declaration is factually correct because it attached "representative examples" of "the various *labels* that had changed over time." [ECF No. 98, p. 9 (emphasis added)]. Therefore, Quincy argues, it "made no representation regarding other marketing material because Plaintiffs had not identified any such marketing material as a basis for certifying a class." *Id.* at p. 8.

At the Court's directive, Quincy submitted additional marketing materials other than labels. It says that "while Quincy does not dispute that certain Prevagen marketing materials may have referenced memory starting in 2007, it maintains that the representations made on Prevagen *labels* – the only representations that all consumers are guaranteed to have seen – evolved and do not present a consistent message regarding memory over time." *Id.* at p. 13. Quincy emphasizes that "this case was about Prevagen *labels*." *Id.* at p. 12.

---

[2]   For example, at the hearing on Plaintiffs' class certification motion, Quincy's counsel explained that the "jellyfish fight aging" label [as opposed to an "improve memory representation] was the "*representative* label that was introduced when the product was launched in 2007." [ECF No. 94, p. 147 (emphasis added)].

But in their reply, Plaintiffs argue that:

> Quincy's excuse for its false representations defies logic and ignores the plain truth that the complaint goes far beyond a discussion of the label on each bottle of Prevagen, and instead alleges that the Apoaequorin Memory Representations are found not only on Prevagen labels, but also on the box each bottle is sold in and in every print, internet, television, radio, and all other advertisements.

[ECF No. 102, p. 5].

Plaintiffs point to allegations in their complaint alleging that the Prevagen misrepresentations can be found "on the front page of Quincy's, website, in every advertisement, be it in print, on the internet, or on television, and even on the front of every bottle of Prevagen." *Id.* (internal citation omitted).

By way of summary on this point, Plaintiffs' reply contends that Quincy is "using nefarious and unfair semantic tricks." *Id.* at p. 4.

The third category of alleged Quincy misrepresentations concern Alzheimer's disease and whether Quincy marketed Prevagen to those suffering memory loss associated with Alzheimer's disease. Quincy represented to the Court that "Prevagen has not been marketed as having the ability to diagnose, prevent, treat or cure Alzheimer's Disease." [ECF No. 93, p. 4]. If Quincy, or any of its representatives, made references to Alzheimer's Disease it was not "in the context of *consumer-facing* marketing, and/or was not related to Prevagen's efficacy with regard to that specific disease." [ECF No. 102, p. 7].

Nevertheless, Plaintiffs emphasize that some materials attached to Mr. Olson's

Declaration "conclusively prove[] that this position is false." [ECF No. 95, p. 12]. Plaintiffs point to scripted infomercials, radio shows, print advertisements and testimonials from Prevagen consumers which all mention Alzheimer's. Although there is no evidence to suggest that Quincy wrote the testimonials about how Prevagen helped Alzheimer's disease patients or suggested Alzheimer's-related language to be included in them, Plaintiffs argue that these testimonials demonstrate that "Quincy was actively *encouraging* that misconception." [ECF No. 95, p. 15 (emphasis in original)].[3]

To oppose these allegations, Quincy notes that the testimonials are from *consumers*, not Quincy, and it argues that the testimonial record is irrelevant because it is an *internal* collection of documents, not a consumer-facing document. It also notes that the two named Plaintiffs did not allege that they purchased Prevagen because of any representations about Alzheimer's Disease. Quincy further highlights the fact that Plaintiff Collins testified that he purchased Prevagen after reading the disclaimer on the product that it is not intended to cure, diagnose, or treat a disease like Alzheimer's.

---

[3] To provide just one of many examples, an April 23, 2009 testimonial said that a "customer who is suffering from Alzheimer's, ti[c]'s, seizures and other neurological issues, has been taking Prevagen since April 6, has seen marked improvements in cognitive function and memory." [ECF No. 95, p. 16]. And a more-recent testimonial (from April 12, 2017, within the four-year statute of limitations) mentions the product's alleged benefit to dementia patients, which Plaintiffs say is inclusive of Alzheimer's patients: "Diagnosed with dementia . . . I gave her prevagen and after 2 weeks she asked 'are you giving me something for my brain? The fog is lifting.'" *Id.* at p. 15.

## II. Did Plaintiffs Comply with Local Rule 7.1?

In addition to asserting substantive arguments in opposition to Plaintiffs' motion for sanctions, Quincy also raises a procedural argument. It says that Plaintiffs failed to comply with the pre-filing meet-and-confer requirement of Local Rule 7.1.

Quincy is correct, as outlined below.

### a. The Facts Concerning Plaintiffs' Purported Pre-Filing Conferral

On Thursday, January 30, 2020, at 2:30 p.m., Plaintiffs' counsel emailed Quincy's counsel regarding "specific statements to the Court that were simply inaccurate" and demanded that Quincy "let Plaintiffs know by tomorrow morning if Quincy will agree to withdraw all such statements that it made on these issues . . . This will serve as our meet and confer, so if Quincy will not agree and Plaintiffs need to take certain action with the Court." [ECF No. 98, p. 14 (internal citations omitted)]. As explained by Quincy, this 2:30 p.m. email failed to identify the alleged statements with any specificity, nor explain what "action" it would take with the Court. *Id.*

At 5:38 p.m. (three hours later on the same date), Quincy's counsel provided its "availability to meet and confer with Plaintiffs on their statements below either over the phone or in person." *Id.* (internal citations omitted). Further, Quincy stated, "We can have a call tomorrow at 4 pm or on Monday. Prior to our meet and confer, provide the page and line citations to the hearing transcript and each document that you contend support each of your statements below." *Id.* at p. 15-16.

Less than thirty minutes later, at 6:03 p.m., Plaintiffs' counsel asserted he would not provide the requested page and line numbers, and further asked that Quincy "agree *tonight* to withdraw all of its false statements to the Court," and that if Quincy disagreed, Plaintiffs would "file their Motion tomorrow." *Id.* at p. 16 (emphasis in original) (internal citation omitted).

The next morning, Quincy's counsel reiterated their availability for a meet-and-confer and asked for information regarding the "type of motion" that Plaintiffs had threatened the night before. *Id*. At 10:07 a.m., Plaintiffs' counsel replied, stating that he had "done everything he could to meet and confer on these very serious allegations," even though Plaintiffs rejected Quincy's *two* previous requests to meet and confer, and Quincy was again provided with no information regarding these "very serious allegations." *Id.* (internal citations omitted).

Quincy highlights the fact that Plaintiffs' 10:07 a.m. email mentioned, *for the first time*, that "the time has come for the Court to consider issuing sanctions." *Id.* Plaintiffs' twenty-page motion was filed less than two hours after the word "sanctions" was first mentioned by Plaintiffs' counsel.

According to Quincy, "the record seems quite clear that Plaintiffs intended to file their Motion regardless of their obligation (and Quincy's offers) to meet-and-confer under Local Rule 7.1(a)(3)." *Id.* at p. 15.

But Plaintiffs contend that they complied with Local Rule 7.1 and that it was

13

Quincy who refused to confer in writing. As explained by Plaintiffs, Quincy insisted not only upon conferring over the telephone, but also tried to impose an additional requirement to confer in person.

      b. Applicable Legal Standards

Local Rule 7.1(a)(3) provides that "counsel for the movant shall confer (orally or in writing), or make *reasonable effort* to confer (orally or in writing), with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve by agreement the issues to be raised in the motion." LR 7.1(a)(3) (emphasis added). Further, "[f]ailure to comply with the requirements of this Local Rule may be cause for the Court to grant or deny the motion and impose on counsel an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee." *Id.*

In addition, although the motion for a show cause hearing to explore sanctions against Quincy and its counsel is not technically a *discovery* dispute, the Undersigned's Discovery Procedures Order provides additional insight into my view of the pre-filing conferral obligation: "Sending an email or telefax to opposing counsel with a demand that a discovery response or position be provided on the same day will rarely, if ever, be deemed a good faith effort to confer before filing a discovery hearing notice." [ECF No. 7, p. 11].

The need for a pre-filing conferral is especially critical when the to-be-filed motion

concerns sanctions against a party and its counsel. If a sanctions award were to be entered against counsel, then there could be profound professional consequences. The specific attorneys named in a sanctions award would need to advise their firm. They and their firm might need to advise their malpractice insurance carrier. The attorneys would likely be required to disclose the sanction to a judicial nominating commission or to a proposed employer. Plaintiffs' motion is based on the Court's inherent authority and 18 U.S.C. § 1927, which both require a finding that the attorney acted in bad faith. *See In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1732 (11th Cir. 2009) (finding sanctions under court's inherent power requires bad faith); *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2016 WL 3944176, at *4 (S.D. Fla. Feb. 9, 2016), report and recommendation adopted, 2016 WL 3944178 (S.D. Fla. Mar. 17, 2016) (attorney's conduct must amount to bad faith to justify § 1927 sanctions).

Plaintiffs' pre-filing conferral efforts were inadequate. Not only did they not provide Quincy with adequate time to respond, but Plaintiffs did not pinpoint the specific comments they were challenging and did not mention the concept of sanctions until shortly before the motion was filed. Moreover, Plaintiffs filed a 20-page motion with incorporated legal memorandum less than two hours after they first mentioned sanctions. Therefore, the Undersigned concludes that Plaintiffs had already prepared the motion and memoranda before they first started the abbreviated and accelerated pre-filing conferral efforts and intended to file it. In other words, it seems as though Plaintiffs

were more interested in filing the motion than in resolving the dispute (and actually persuading Quincy to withdraw or modify statements or representations made to the Court).

Given Plaintiffs' failure to conduct a good-faith conferral before filing the motion, the Undersigned **denies it without prejudice**. Although the Court is not naïve enough to believe that a good faith conferral would have persuaded Quincy to agree to a show cause order or a sanctions award, a meaningful conferral could have eliminated or streamlined some of the issues and also led to clarification of certain statements by Quincy.

Because the denial is without prejudice, Plaintiffs are free to refile the motion, after engaging in a good faith pre-filing conferral. However, the motion argued that Quincy's purported "pattern of misrepresenting crucial facts" was designed to "prevent Plaintiffs from ever seeking class certification" -- but that process has already moved significantly forward now that a Report and Recommendation has issued on the class certification motion. [ECF No. 95, p. 1].

To be sure, Plaintiffs' motion discusses several problematic representations by Quincy and its counsel which generate significant concern, and which could justify a refiled motion. Advising me that the settlement had a "very good chance" of being approved without also advising me that Quincy had not had any recent discussions about

16

injunctive relief with the FTC and NYAG was, to be diplomatic, risky and ill-advised.[4] And representing that Quincy first started using the "improves memory" label for the first time in late 2012 without disclosing earlier marketing efforts which mentioned memory was, to use an incredibly benign interpretation, a classic illustration of poor judgment. Boldly declaring that Quincy never made *any* consumer-facing representations about Prevagen's potential benefits for Alzheimer's patients is, at best, a reckless statement based on a blinkered view of the product's history. And arguing that this case is about representations only on labels (to the exclusion of product inserts, packing, and advertising) is a tunnel-vision approach to the myriad allegations in the first amended complaint.

On the other hand, Quincy has suggested that Plaintiffs and their counsel are **themselves** in a dicey spot because they could be subject to Rule 11 sanctions. For example, advising this Court that a Settlement Stipulation signed by Quincy and Plaintiffs in three separate Southern District of New York lawsuits and jointly submitted to a federal district judge was merely something made up by "two friends [who] got together and created an agreement" seems to be a cavalier description of the document. [ECF No. 98, p. 6]. In addition, Plaintiffs' counsel did not clearly explain that the Settlement Stipulation could theoretically still go forward, if approved by the presiding

---

[4] If Quincy's attorney did not know the status of the negotiations with the FTC and NYAG, then he could have told the Court that this lack of knowledge prevented him from answering my question on the likelihood that the settlement would be approved.

judge, even without an agreement by the FTC and NYAG.

Moreover, Quincy describes Plaintiffs' allegations against it and its counsel as "spurious," and it refers to a representation made by Plaintiffs' counsel -- i.e., that the instant motion is the first one he has ever brought to seek a show cause order for sanctions against a party or its counsel -- as an example of his alleged lack of credibility. *Id.* at p. 2.

According to Quincy, it is aware of at least four other sanctions motions which Plaintiffs' counsel has filed in this district alone. But Plaintiffs counter that argument by saying that (1) Quincy pinpointed only one other case where their attorney moved for sanctions; (2) two other cases involved successful sanctions motions brought by other co-counsel; and (3) the magistrate judge in one case concluded that the defendant bank was stonewalling in discovery and acting in bad faith. But even if all three of those points are factually correct, Quincy might still view the bold and unequivocal representation by Plaintiffs' counsel to be, to use a passive perspective, incorrect in part and otherwise incomplete (and therefore arguably misleading).

In any event, the point is that Plaintiffs have the *power* to refile the motion, but they may want to consider two well-known proverbs before launching another litigation sanctions bomb: (1) the resulting scenario could generate a "pot-calling-the-kettle-black" situation, and (2) "people who live in glass houses should not throw stones."

One final point, and it's a quote from Sun Tzu, Chinese military strategist (545 BC - 470 BC): "He will win who knows when to fight and when not to fight."

### III.     Conclusion

The Undersigned **denies without prejudice** Plaintiffs' motion for a show cause hearing concerning sanctions against Quincy and its counsel. If Plaintiffs wish to refile their motion based on the same grounds as were advanced in the now-dismissed motion, then they must do so by April 2, 2020 (after a good faith Rule 7.1 conferral).

**DONE AND ORDERED** in Chambers, in Miami, Florida, on March 26, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Marcia G. Cooke
All counsel of record